**\*DICKINSON v. PERRY.**

No. 9118.—Opinion Filed May 27, 1919.

(Syllabus by the Court.)

1. **Appeal and Error—Master and Servant —Service Letter—Truth—Question for Jury—Affirmance of Verdict.**

Where a railway company dismissed from its service an employe who had served the company for nine years in the capacity of switchman in its yards, and, while in the discharge of his duties, was thrown from a box car by reason of a defective brake, and received injuries for which the company voluntarily compensated him, and on being discharged from the hospital where he had been sent for treatment by the agents of the company, the physician in charge gave him a letter addressed to the yardmaster of the company where the employe had formerly worked for the company, which letter stated: "In the case of D. J. Perry injured at Shaw-

*Appealed to the Supreme Court of the United States.

nee, Oklahoma, on June 30, 1913, the injured party was able to resume work on the day of his return. He leaves Chicago Dec. 5, 1913"—and in a few days after his return he presented himself to such yardmaster and offered to resume his former duties and exhibited to him such letter, at the time the yardmaster saying, "Dan, you are out of service, you are ineligible, and you will have to see the superintendent," and he thereafter saw the superintendent and asked for re-employment, and was by said superintendent informed that, according to the doctor's report, he could not do anything for him, and thereafter he asked the superintendent for a service letter, who, in a few days thereafter, sent him a letter as follows: "That Daniel Jackson Perry has been employed on the Indian Territory Division of the Chicago, Rock Island & Pacific Railway Company as switchman from November 1, 1904, to July 1, 1913. Dismissed: Account responsibility in case of personal injury to himself June 30, 1913. Services otherwise satisfactory. H. F. Rettig, Supt." —and thereafter he again applied to the superintendent of said company for re-employment, and was again informed by the said superintendent that he was incapacitated according to the doctor's report; and he thereafter applied for work as switchman to the officers who were empowered to hire switchmen of four other railway companies, each time exhibiting his service letter, and each time failing to receive employment; and he thereafter filed suit against the receiver of such company so issuing said service letter for damages, making the same a part of his petition, and by proper averments charged that the language used in the said service letter stating why he was dismissed from the service of the railway company was untrue, and that, as a result of the untruthfulness thereof, he had been blacklisted, and on account thereof refused employment by other railway companies, and that he could never secure employment from any railway company on account thereof, and as a direct and proximate result of said blacklisting he had been damaged in the sum of $20,000—held:

(a) That the truthfulness or untruthfulness of the statement contained in such service letter was an issue properly joined by the pleadings, and was a proper question for decision by the jury; and

(b) That, where special damages were alleged by the plaintiff and competent testimony offered in support thereof, the questions of the truthfulness or untruthfulness of the statement contained in the service letter as to why the plaintiff was dismissed from the service of the railway company and the measure of his damages were correctly submitted to the jury by the court, and where the jury thereafter returned a verdict in favor of the plaintiff, assessing his damage in the sum of $3,000, and the trial court approved the same, the judgment should be affirmed.

**2. Constitutional Law—Employers' Service Letters—Due Process of Law—Equal Protection of the Laws.**

Section 3769, Rev. Laws Okla. 1910, requiring that public service corporations give to employes discharged or leaving the service, a letter stating the nature of the service rendered and the cause for which the employe was discharged or quit the service does not deny to such public service corporations due process of law, and is not violative of section 7, art. 2, of the Constitution of Oklahoma, nor of the Constitution of the United States, or the Fourteenth Amendment.

**3. Master and Servant—Service Letter—Police Power.**

Requiring public service corporations to give a letter as designated in the foregoing paragraph of the syllabus, commonly known as a "service letter," is a requirement which affects the public welfare, and is a valid exercise of the police power of the state.

**4. Constitutional Law—Free Speech—Employers' Service Letters.**

The requirement that a public service corporation shall give a service letter as described in the second paragraph of the syllabus herein is not a violation of section 22, art. 2, of the Constitution of Oklahoma, guaranteeing the right of free speech.

**5. Appeal and Error—Verdict—Review.**

Where there is competent evidence reasonably tending to support the verdict of the jury and the instructions of the court to the jury fairly state the law arising upon the issue raised by the pleadings and the evidence, the judgment rendered upon the verdict will not be disturbed by the Supreme Court.

Error from District Court, Oklahoma County; Edward Dewes Oldfield, Judge.

Action by Daniel J. Perry against J. M. Dickinson, receiver for the Chicago, Rock Island & Pacific Railway Company. Demurrer to plaintiff's evidence overruled, judgment for plaintiff, motion for new trial denied, and defendant brings error. Affirmed.

C. O. Blake, K. W. Shartel, R. J. Roberts, and W. H. Moore, for plaintiff in error.

Vaught & Brewer, for defendant in error.

JOHNSON, J. This is an appeal from the district court of Oklahoma county. Daniel J. Perry, defendant in error, plaintiff below, on the 11th day of March, 1916, commenced this action against J. M. Dickinson, receiver for the Chicago, Rock Island & Pacific Railway Company, a corporation, plaintiff in error, defendant below, by filing his petition, which was afterwards amended, to recover the sum of $20,000 damages. For convenience the parties will hereinafter be re-

ferred to as plaintiff and defendant, as they respectively appear in the court below.

The amended petition of the plaintiff is quite lengthy; therefore only the substance of the same will be stated.

He alleged that the defendant was receiver of the railway company named; that on the 30th day of June, 1913, the plaintiff was in the employ of said railway company in the city of Shawnee, Okla., as switchman; that on said date he was in discharge of his regular duties, and in setting the brake on a box car received injuries on account of a defect in the brake and its appliances, which defect was known to the agents and employes of the railway company, or could have been known with the exercise of proper diligence; that he was severely injured, describing his injuries, and that on account of same he was taken to the railway company's hospital in the city of Shawnee, where he was kept for two months, and for another month he spent his time at the hospital and at his home, going back and forth, and that thereafter he was advised by the physicians and representatives of the railway company that he would be ready for work within a very short time; that he entered into a settlement with the railway company for the damages he had sustained because of said injuries, and executed a release to the company for the same; that, after he had done so, he was taken worse, and said railway company, at its own expense, carried him to the hospital of said company, in the city of Chicago, where he was treated for approximately one month by a physician of said company; that thereafter he returned to Shawnee on or about the 17th day of December, 1913; that he was weak and run down, and remained at his home for approximately 60 days; that when he left the hospital in Chicago he was given a certificate directed to the general yardmaster of said railway company at Shawnee, Okla., advising said yardmaster that he was able to resume his work on his return to Shawnee, which certificate he attached to his amended petition, causing the same to be marked Exhibit A; that on his return to Shawnee he reported to the yardmaster of the company and was advised that he was out of service because he was ineligible for duty; that the report of the doctor showed he was incapacitated, and to see the superintendent; that he saw the superintendent, who informed him he was incapacitated according to the doctor's report, whereupon he exhibited the certificate marked Exhibit A, the superintendent remarking, "I have got nothing like that in my office."

Following this the plaintiff makes specific allegations in his amended petition which are as follows:

"Plaintiff alleges that said railway company refused to re-employ this plaintiff, although this plaintiff continued to apply for work from December, 1913, until August, 1915. On August 18, 1915, the said railway company, through its superintendent, H. F. Rettig, at Haileyville, Okla., issued to this plaintiff a service letter, a copy of which service letter is hereto attached marked Exhibit B and made a part of this petition; that after the issuance of said service letter, which service letter stated, after reciting the length of time which this plaintiff has been employed by said railway company: 'Dismissed: Account responsibility in case of personal injury to himself, June 30, 1913. Services otherwise satisfactory'—this plaintiff tried again to secure employment from said railway company, and he was advised by those having the authority to employ him and by various employes of said railway company that he could never secure employment from any railroad company under that service letter, as it meant that he was blacklisted, and meant also that he was personally responsible for his own accident, and that he could never secure employment from another railroad company."

That in the year 1915 he applied for employment at Ft. Worth, Tex., to the general yardmaster of the International & Great Northern Railway Company, and that he exhibited his service letter, marked Exhibit B, whereupon the yardmaster replied, "We can't use you on account of this letter." That thereafter he applied to the general yardmaster of the Texas & Pacific Railway Company at Ft. Worth, Tex., to whom he exhibited his service letter, whereupon the yardmaster replied, "Can't use you on that letter."

Plaintiff alleges that he was 51 years of age, and had been in the railroad business for more than 25 years; that he was in good health except for an occasional hurting in his back, but that he worked regularly at some kind of employment; that at the time of his injury he was receiving from the railway company $105.50 per month for 31 days; that he is now compelled to take such work as he can get at $1.50 per day or less; that he spent the best years of his life in preparing and equipping himself as a railroad man; that he is an experienced and trained brakeman and switchman, but, because of the issuance of said service letter by the railway company, cannot procure employment either from defendant company or from any other railroad company; that by said service letter he has been blacklisted and been denied employment by other railroad companies because of the wording of said letter; that by and under the American

Mortality Table his expectancy is approximately 20 years, and that the compensation for switchmen or brakemen is not less than $100 per month; that said service letter did not truly state the facts or give the true reason for his discharge; that his failure to obtain employment from other railroad companies was due directly and proximately to the issuance and contents of said service letter; that said letter upon its face charged the plaintiff with being responsible directly for the injuries which he sustained on June 30, 1913, and that said statement is untrue, and was known to be untrue by the railway company; and that the railway company admitted its liability for said accident by making settlement with the plaintiff for such injures by caring for him in its hospital both in Shawnee and Chicago, and rendering professional services free to him.

The following is a true copy of Exhibits A and B with all indorsements thereon:

"Exhibit A.
"Rock Island Lines, Surgical Department.
"Chicago, Ill., Dec. 5, 1913.

"Mr. C. C. Rettig, Gen'l Yardmaster, Shawnee, Oklahoma—Dear Sir: In the case of D. J. Perry injured at Shawnee, Oklahoma, on June 30, 1913, the injured party was able to resume work on the day of his return. He leaves Chicago Dec. 5, 1913.

"Yours truly,
"Ferd. Engelbreetson, M. D.,
"Local Surgeon, Chicago, Ill."

"Exhibit B.
"Haileyville, Okla., August 18, 1913.

"This is to certify that Daniel Jackson Perry has been employed on the Indian Territory Division of the Chicago, Rock Island & Pacific Railway Company as switchman from November 1, 1904, until July 1, 1913.

"Dismissed: Account responsibility in case of personal injury to himself June 30, 1913. Services otherwise satisfactory.

"H. F. Rettig, Superintendent.

"Rock Island Lines, Office of Superintendent. Haileyville, Oklahoma. Indian Territory Division. Aug. 19, 1915."

The defendant answered, admitting his receivership, then filed a general denial, then answered specifically as follows:

"This defendant avers that said statute of the state of Oklahoma upon which plaintiff bases his action and for which plaintiff seeks damages by reason of the breach of the same by this defendant was, at date of its passage and approval and at the date of the issuance of the service letter set out by the plaintiff therein as Exhibit B, unconstitutional and void, and deprived this defendant of due process of law and the equal protection of the law as guaranteed to him under the Fourteenth Amendment of the Constitution of the United States and section 7 of article 2 of the Constitution of the state of Oklahoma, in denying to this defendant freedom of speech and the press, including the right to remain silent."

The case was tried to a jury, who returned a verdict in favor of the plaintiff for $3,000, upon which verdict the court rendered judgment.

A timely motion for new trial was made by the defendant, which being overruled by the court, the defendant excepted, appealed to this court, and assigns error.

The plaintiff testified that he was 51 years old; resided in Shawnee, Okla.; his occupation was that of railroading and had been since 1889; that he had been in the employment of the Rock Island Railroad Company for 9 years; that previously he had worked for the Kansas City, Ft. Scott & Memphis, Illinois Central, and Mobile & Ohio Railroad Companies; that he began work for the Rock Island Railway Company in 1904 at Shawnee, Okla., and continued until 1913, in the capacity of switchman; that he never had suit against the company to recover for personal injuries; and that he was injured about June 30, 1913, while in the discharge of his duties as employe of the company in the Shawnee yards in substantially the following manner:

"We were switching up there by the house track and was kicking a car, the fireman and the man who was following the engine, kicking a car in, and, as I was working the field, it was my duty to catch this car. I got on this car and set the brakes, and when I had set the brake, I started to get off, and never took one of my hands off the brake wheel, and the dog slipped out of the ratchet and let the wheel reverse, and the way I was sitting I fell from there to the ground on the end of some ties."

It seems that there was a hole that had worn too much, and it gave the dog too much play; he never used that particular car before; that he fell off the car to the ground; that after the injury he went home and stayed there four days and nights, and then he was carried to the hospital in Shawnee by the railroad company's doctor. He stayed there and at home four or five months back and forth. He lived about a mile from the hospital, and the railway company would send him back and forth in a cab or hack; the orders being given by the company's physician, Dr. Blickenderfer.

The court sustained the motion by defendant's counsel to strike out the testimony as to the condition of the brake and instructed the jury to disregard it, to which plaintiff,

through his counsel, excepted. Plaintiff's further testimony was that the company settled with him for his injuries through its claim agent, Mr. Charles Hardcastle, after he was released from the hospital in Shawnee; that he took a backset, and the company, through Mr. Hardcastle, gave him transportation to the hospital in Chicago, where he remained about a month, the company paying his expenses; he was not out a cent; that he left the Chicago hospital in December, at which time he was given by the surgeon in charge a paper which he identified as Plaintiff's Exhibit A, which was offered in evidence over the objection of the defendant; that he returned to Shawnee some time in September and showed Exhibit A to the defendant's yardmaster, Mr. Rettig; that Mr. Rettig handed it back to him, said he could not employ him because "I was incapacitated. I said, 'There is the report of the doctor that says I am able for duty, and this is the last doctor that had his hands on me;' that when I got back from Chicago, and as soon as I picked up a little and felt like I was strong enough, I went to the yardmaster and told him that I was ready for duty, and showed him that letter, and he said, 'Dan, you are out of service.' I said, 'What's the cause, Pete?' and he says, 'Ineligible; you will have to see the superintendent.'" He made application for employment, when he was informed by the yardmaster, "Pete," that he was out of service. "I says, 'What is the matter, Pete?' and he says, 'You are ineligible.' I says, 'What will we do about it?' and he said, 'You will have to see Mr. Rettig, the superintendent.'" That he saw Mr. Rettig, who said, "Dan, I have been busy today and I will see you the next time I come in." "When he came in again I saw him and talked a while, and he said, 'Dan, I can't do anything for you; the reason I put you off was to look up the doctor's reports, and according to the doctor's reports I can't do anything for you.' I then asked for a service letter two or three times, and he said he would give me one." He identified Exhibit B and said it was the letter given him; testified that he had known Mr. Rettig about 12 years, was acquainted with his signature that long, and had seen him write his name frequently, and that the service letter contained Mr. Rettig's signature. Exhibit B was then read to the jury without objection. He testified that he afterwards applied to the defendant company's yardmaster at Shawnee, a Mr. Wray, for employment, the man who employs switchmen. He applied for the position of switchman, and he was not employed. Mr. Wray refused to employ him. That he exhibited to him his service

letter and was refused employment. That he made settlement for his injuries with Mr. Charles Hardcastle, claim agent for the defendant company, who told him that he had made investigation as to the condition of the brake on the car, and, as there was a deficiency in the brake, they were ready to settle for it. That he had been to doctors in Shawnee, Dr. Rowland, the trainmen's doctor, and Hughes and Herrington, the switchmen's doctor, and that Dr. Blickenderfer waited on him all the time. That Dr. Blickenderfer was the company's doctor, and that he told him that he would be able to go to work in a couple of months. "At the time I applied for work to the yardmaster at Shawnee, he said, 'The doctors have got you, Dan; we can do nothing for you'— this was before I got the service letter—and for me to see the superintendent."

The plaintiff testified that after he was refused employment by the Rock Island Railway Company he applied to a Mr. J. F. Ingram, yardmaster of the Texas & Pacific Railway Company at Ft. Worth, Tex., and gave him his service letter, Exhibit B, and that he failed to get employment, and also to the International & Great N. Railway Company at Ft. Worth, Tex., he showed his service letter and failed to get employment; also to the Ringling Road at Ardmore, Okla., and showed his service letter to the superintendent, who read it and he failed to get employment; also to the Katy Railway Company at Oklahoma City, to Mr. Gardner, the trainmaster, and showed him the service letter; that he read it, and that he failed to get employment, and that during all this time he was able to do the class of work that he had done for the Rock Island Railway Company, and that he was familiar with the way that employes severed their connection with the railway companies and secured employment with them, and that when one left the railway company of his own volition and desired to secure employment from another railway company it was necessary to get a service letter showing the date he commenced and the date he quit, and that, when he secured employment with another company, it was necessary to show his service letter, and when he went to work for the Rock Island Company he had a service letter and showed it before he was employed. He also testified that in setting the brake upon the box car at the time he was injured he did it in the same way that he had always handled brakes on similar occasions.

It was admitted in the record that the American Mortality Table showed that the expectancy of a person 51 years of age is slightly in excess of 20 years.

That was, in substance, all the testimony of the plaintiff upon the trial, at the conclusion of which the defendant demurred to the evidence of the plaintiff, which was by the court overruled, and excepted to by the defendant; whereupon the defendant called as witnesses:

H. F. Rettig, who testified that he was the superintendent of the Rock Island Railway Company, had been in the railroad business 21 years, and superintendent of the Rock Island for five years, and that before he became superintendent of the Rock Island Company he was trainmaster for said company; that he was familiar with the plan of hiring employes for the Rock Island Company, and that he had never issued an order requiring service letters from the men who sought employment, and that it was not the policy of the Rock Island Company; that it was the policy of his company not to hire men for the first time to do switching and braking who were over the age of 45 years; that he did not dismiss men from their service who had attained the age of 45 years while employed.

Mr. C. B. Wildman testified that he lived in Van Buren, Ark., and that he was working for the Iron Mountain Railway Company in the position of superintendent; that the company had a policy restricting the age at which switchmen would be employed for the first time, and that he did not employ men over the age of 45 years; that was the general policy of his road; and that he did not demand service letters of applicants for employment.

The next witness called by the defendant was J. M. Chandler, who testified that he lived at Springfield, Mo., and that he was inspector of transportation for the Frisco Railway Company, and that he had held the positions of trainmaster and superintendent and various other minor positions; been in the railroad business 19 years; that the Frisco had a policy with reference to the employment of switchmen and did not employ them for service beyond the age of 45 years; and that it did not require service letters of persons making application for employment.

Dr. G. S. Baxter was next called by the defendant, who testified that he lived at Shawnee, Okla., and that he was a physician and a graduate from the Memphis Hospital Medical College, and was acquainted with Dan Perry; had known him for six or seven years; that six or seven years before he treated him for lobular pneumonia, and that he treated him from about August to September, 1913, and made an examination and found him suffering with the disease arterio sclerosis, which is a hardening of the blood vessels, and that a patient suffering from that disease grew progressively worse; that it was a disease of old men, but young men may have that condition; that he had not examined Mr. Perry since.

The defendant next called Dr. T. D. Rowland, whose testimony in substance was the same (he had known Mr. Perry probably 20 years), and Dr. E. E. Rice, who lived at Shawnee, whose testimony was in substance the same. The witness H. F. Rettig was not interrogated concerning the issuance of the purported service letter by him to the plaintiff.

The defendant in his petition in error makes the assignment:

"That the trial court erred in overruling the motion of said plaintiff in error for new trial."

His first specification of error in the foregoing assignment is:

"That the court erred in failing to direct a verdict for the defendant as requested, because the proof failed to show that the service letter given the plaintiff did not truly state the cause of his discharge."

We hold that there is no merit in this contention, as we find that the testimony of the plaintiff tends strongly to show affirmatively that the service letter did not truly state the cause of the discharge, and the testimony offered by the defendant negatively tended to prove the same thing, in that it practically all tended to show that the real cause of the plaintiff's dismissal from the service of the railway company was because he was physically incapacitated for the duties of switchman, and that the trial court's refusal to give the peremptory instructions was not error. M., O. & G. R. Co. v. Davis, 54 Okla. 672, 154 Pac. 503; Menten v. Richards, 54 Okla. 418, 153 Pac. 1177; Mountcastle v. Miller, 66 Oklahoma, 166 Pac. 1057.

The defendant's second specification of error is:

"The court erred in failing to direct a verdict for the plaintiff as requested because the service letter statute on which recovery was sought violated the provisions of the Constitution of Oklahoma as set forth in sections 7 and 22, art. 2, because it denied to the defendant federal rights guaranteed under the Constitution of the United States and the Fourteenth Amendment thereof."

We are therefore called upon to determine the constitutionality of the Service Letter Law, to wit, section 3769, Rev. Laws 1910, which reads:

"Whenever any employe of any public service corporation, or of a contractor, who works for such corporation, doing business in this state, shall be discharged or voluntarily quits the service of such employer, it shall be the duty of the superintendent or manager, or contractor, upon the request of such employe, to issue to such employe a letter setting forth the nature of the service rendered by such employe to such corporation or contractor and the duration thereof, and truly stating the cause for which such employe was discharged from or quit such service; and if any such superintendent, manager, or contractor shall fail or refuse to issue such letter to such employe, when so requested, or shall willfully or negligently refuse or fail to state the facts correctly, such superintendent, manager or contractor shall be deemed guilty of a misdemeanor and upon the conviction thereof shall be punished by a fine of not less than one hundred dollars and not more than five hundred dollars, and by imprisonment in the county jail for a period of not less than one month and not exceeding one year: Provided, that such letter shall be written, in its entirety, upon a plain sheet of white paper to be selected by such employe. No printed blank shall be used, and if such letter be written upon a typewriter, it shall be signed with pen and black ink and immediately beneath such signature shall be affixed the official stamp. or seal of said superintendent, manager, or other officer of such corporation or contractor, in an upright position. There shall be no figures, words or letters used, upon such piece of paper, except as are plainly essential, either in the date line, address, the body of the letter or the signature and seal or stamp thereafter, and no such letter shall have any picture, imprint, character, design, device, impression or' mark, either in the body thereof or upon the face or back thereof, and any person of whom such letter is required who fails to comply with the foregoing requirements shall be liable to the penalties above prescribed."

The presumption is in favor of the constitutionality of the statutes, and this court, wherever possible to do so, will uphold the constitutionality of an enactment of the Legislature. In M., K. & T. R. Co. v. Walker, County Treas., et al., 54 Okla. 359, 362, 154 Pac. 343, 344, it is said:

"The act being susceptible of a construction which will uphold it, the courts will so construe it. C., R. I. & P. R. Co. v. Beatty, 34 Okla. 321, 118 Pac. 367, 126 Pac. 736. 42 L. R. A. (N. S.) 984; St. L. & S. F. R. Co. v. Zalondek et al., 28 Okla. 746, 115 Pac. 867."

Lewis' Sutherland on Statutory Construction, sec. 82, states the rule followed by the courts in construing statutes as follows:

"Their presumption is in favor of the validity of the act of the Legislature. and all doubts are resolved in support of it. 'In determining the constitutionality of an act of the Legislature, courts always presume in the first place that the act is constitutional. They also presume that the Legislature acted with integrity and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution. The Legislature is a co-ordinate department of the government, invested with high and responsible duties, and it must be presumed that it has considered and discussed the constitutionality of all measures passed by it.' The unconstitutionality must be clear or the act will be sustained."

It is not therefore necessary for this court to inquire into the necessity of the legislation or the motives which prompted the enactment of the law contested in this court. The Legislature is itself the judge of the conditions which warrant legislative enactments, and these laws are only to be set aside when they involve such palpable abuse of power and lack of reasonableness to accomplish a lawful end that they may be said to be merely arbitrary and capricious, and hence out of place in a government of laws, and not of men, and irreconcilable with the conception of due process of law. McGehee on Due Process of Law, p. 306. A legislative enactment will not be declared invalid by the courts unless such enactment is arbitrary and unreasonable.

Whether or not the custom still prevails, it appears that at one time it was the rule among railway companies and other corporations to keep a list of employes who were discharged or left the service and to furnish such list to other railway companies and employers. Any reason which might be agreed upon among employers was sufficient for "blacklisting" employes, thereby possibly preventing their again securing employment in their accustomed occupation or trade. It was this abuse, among other things, which caused the Legislatures of various states to enact laws declaring blacklisting unlawful, and requiring corporations to give a letter to employes discharged or leaving the service, setting forth the reasons for the discharge of the employe or of his leaving the service and the nature of the service rendered by the employe.

Labatt, in his work Master and Servant, vol. 5, sec. 2031. in discussing legislation of this character, says:

"It is apprehended that any harm which may result from a moderate limitation of the rights of employers in this respect will be slight in comparison with the evil consequences which are certain to follow if a practice so essentially repugnant to the free institutions of Anglo-Saxon civilization as that of systematic 'blacklisting' is allowed

to remain unregulated. The inevitable effect of such a practice must be the subjection of a constantly increasing number of employes to disabilities and restrictions scarcely less oppressive than those to which servants were formerly subjected in England by statutory provisions long since obsolete."

As illustrative: "In 5 Eliz. c. 4, sec. 10, it was enacted that a servant in any of the various occupations specified should be liable to imprisonment if he departed from the city or parish in which he had been employed, without obtaining an official testimonial stating that he was licensed to depart from his master, and at liberty to serve elsewhere."

It is suggested by the author that:

"It is manifest that, if the practice of 'blacklisting' is left unchecked, the employers of our own times will be able, by private compacts, to place large bodies of employes in a position analogous to that which would result from the operation of such a statute."

The idea of requiring employers to give employes leaving their service a letter showing the character of work performed while in their service is not a new one. The common law recognized a moral obligation resting upon the employers to give a "character" to servants leaving the employment of their masters, but no legal obligation of this nature existed until laws touching these matters were enacted.

Labatt, in his Master and Servant, vol. 5, secs. 2013, 2014, says:

"The doctrine of the English and American courts is that a master is morally, but not legally, bound to give a character to the servant when he is discharged from or leaves the employment. * * * The extreme severity with which the rule may sometimes operate has recently been shown in a very striking manner by its application in that class of cases in which several employers in a certain line of business entered into a mutual agreement that no person who has previously been in the services of one of them shall be hired by any other, unless he can produce what is known as a 'character card' from his last employer. * * * In some jurisdictions the common-law rule has been modified by statutes applicable either to employers generally, or to employers of a particular class, and there seems to be good reason to anticipate that enactments of this type will be greatly multiplied in coming years. The desirability of thus supplying the deficiencies of the common law cannot be consistently disputed by any one who is of the opinion that it is proper to protect employes by legislation against 'blacklisting.' Manifestly the refusal to give a character may often be virtually the equivalent of 'blacklisting' so far as regards the injury inflicted on the servant."

The legislation is attacked herein upon the grounds that it is in violation of section 7 of article 2 of the Constitution of Oklahoma, which provides that no person shall be deprived of life, liberty, or property without due process of law, that it is in violation of section 22, art. 2, of the Constitution of Oklahoma, in that it denies the right of free speech, and that it is in violation of the Constitution of the United States and the Fourteenth Amendment thereof, in that it denies to the defendant due process of law and equal protection of the law.

The right of contract may not be arbitrarily interfered with and comes within the protection of the provisions of the Constitutions of the State of Oklahoma and the United States protecting the life, liberty, and property of the citizens of the state. But the right of contract is not an absolute and unyielding right. It is subject to limitations in the interest of the public welfare. Thus legislation has been enacted to prevent the purchase or sale of lottery tickets. Minors are denied the right to make contracts except for the necessities of life. Corporations are denied the power to make contracts releasing themselves from negligence. The Constitution of the state prohibits the granting of perpetual or exclusive franchises within municipalities of the state. Section 5, art. 18, Constitution of the state of Oklahoma. Legislation has been enacted limiting the number of hours per day that corporations may contract with workers for employment. The list of laws which have been passed limiting the power of contract in the interest of public health, safety, and welfare might be continued, but it is not necessary to illustrate the point.

It is assumed by those who challenge the constitutionality of the law requiring employers to give service letters to their employes that the utmost freedom of contract now prevails, and that the employer deals with men who are at liberty to accept employment or not, as they like. During times of prosperity and when there is a scarcity of labor, this, in many instances, may be true, but ordinarily the individual employe is not on an equality with his employer so far as accepting or rejecting terms of employment is concerned. The average employe is a man of limited means, depending upon his day's wages for sustenance for himself and family. He is compelled to accept conditions as he finds them and to make such wage bargains as are offered him. It is only through the efforts of employes as organizations, through the policy of far-seeing employers, or through legislative enactments that a general amelioration of conditions is brought

about. Employers and employes do not, therefore, deal on terms of absolute equality, and liberty of contract exists often only in theory. Hence reasonable limitations in the interests of public health, safety, and welfare may be thrown about the contracts which employers make with their employes.

There is nothing in the law contested which attempts to prevent a corporation from hiring whomsoever it pleases, or from discharging its employes when it sees fit. Neither is there anything in the law which requires a corporation to give a letter of recommendation to employes discharged or leaving its service. All that is required is a statement of the employer showing the character of services rendered by the employe and the reason for his leaving the service of his employer. It is a certificate which, when the facts are favorable to the employe, may assist him in securing other work along the line of his trade, and is a certificate to which he feels that in justice he is entitled.

The custom of giving a certificate is so general that in our opinion objection would not be raised by railway companies to giving employes a certificate of this character were it not for the misconception which existed in the earlier days of the common law in reference to the treatment of servants by masters, and the earlier decisions of the courts based on the laws which reflected conditions then, but which no longer exist. There is nothing unusual or revolutionary in requiring the employer to give a certificate to the employe leaving his service showing the time he has been employed and the character of service rendered. A certificate is the usual and customary method to indicate what has or has not been done. 11 C. J. 76. Thus we have certificates of courts, public officials, and persons transacting business. Schools and colleges give a certificate or a diploma to those who have completed a required course of study. Persons who have passed examinations are entitled to a certificate showing their competency to enter a profession. Even those who fail in examinations are furnished with a statement of grades made. Soldiers leaving the army, after completing the period of their enlistment, are given a certificate of discharge. The employe who perhaps has devoted years of his life to a particular trade, when relinquishing employment, is without evidence to present in another locality or to another employer unless he has some certificate showing the term and character of his previous employment.

It has been said that if a service letter speaks the truth, employers will be subject to libel and damage suits, but this assumes that justice cannot be secured in the courts, a presumption in which we cannot indulge, and one which is an unwarranted reflection upon our judicial system.

This legislation, we think, is a warranted and lawful exercise of the police power of the state. The police power of the state was not surrendered with the adoption of the federal Constitution nor taken from the states by the ratification of the Fourteenth Amendment. This power, though not precisely defined, includes the right to legislate on any matters pertaining to the health, safety, and welfare of the public.

It is argued that the law in question involves a private, and not a public, matter, in that only the individual employe and the individual employer are concerned. This is pure assumption and fails to recognize conditions as they exist. The welfare of society very largely depends upon the condition of employes and the relationship of labor and capital, and any lack of morale of employes is quickly reflected in the industrial world. The welfare of employes affects the welfare of entire communities and of the whole public. Failure of employes to work on account of strikes and other causes may paralyze the commerce of the entire country. Legislation has been enacted to shorten the hours of labor and to provide time for recreation and to require the protection of the health and safety of employes. Such legislation, while affecting one particular class, indirectly affects the welfare of the entire public. Employes of railway companies are engaged in handling the commodities of the whole country, and any legislation which has to do with their protection, their comfort, and their welfare is legislation which may be said to be enacted under the broad powers giving the right to legislate in the interests of public welfare, and such legislation may therefore be said to be legislation within the police power of the state.

The Service Letter Law is in line with the spirit of a progressive age. It aims to protect the wage-earner in his right to work and labor for himself and for those who are dependent upon him. It aims to protect him from a condition that might pauperize him and his family and indirectly reflect itself in the conditions of society. Cheek v. Prudential Insurance Co. of America (Mo.) 192 S. W. 387, at page 392 (L. R. A. 1918A, 166). In this case the Supreme Court of Missouri, in construing a statute similar to the statute of Oklahoma, said:

"The statute in question is a wise exercise of the police power of the state; it af-

fects a class composed of many thousands of people as to whom, if not protected from the evil mentioned, great hardships, injustice, and oppression could be perpetrated upon them. The same principle of police regulation lies at the base of this class of contracts that underlies the regulation of almost every other species of contracts negotiated in this state, the validity of which is no longer challenged."

We think that the legislation attacked does not deny to the defendant due process of law, that it does not constitute an illegal infringement upon the right to contract, and that it is within the police power of the state.

It is argued that this legislation is a denial and abridgment of the right of free speech. Labatt, Master and Servant, vol. 8, sec. 2867, suggests:

"The theory that a constitutional provision which merely purports to secure freedom of speech includes by implication a guaranty of the 'liberty of silence' seems to involve some very questionable logic."

With this statement we fully agree.

The right of free speech is not an absolute one; neither is the right to remain silent. One does not have the absolute right to speak that which may injure the public or an individual, or to remain silent when silence would work a similar result. In Schenck v. United States, 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. ——, it is said:

"The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 439, 55 L. Ed. 797, 805, 34 L. R. A. (N. S.) 874, 31 Sup. Ct. 492. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."

Numerous instances may be cited wherein persons are not privileged to remain silent without suffering the penalty therefor. Refusal of a witness to testify may constitute contempt of court (13 C. J. p. 25, sec. 36. and

Okla. Cr. 110, 100 Pac. 39), and the same may be indictable (29 Cyc. 333). Failure of one accused of crime to speak may be relevant as tending to show guilt (21 Cyc. 421); and an unanswered relevant statement, taken in connection with a failure to reply, may be admissible evidence tending to show a concession of the truth of the facts stated (16 Cyc. 956). Silence may work an estoppel. 16

Cyc. 681, 759. Failure to disaffirm a contract made by an infant, after reaching his majority, constitutes ratification of same. 22 Cyc. 607. In contracts acceptance of an offer may be inferred from silence (9 Cyc 258), and failure to repudiate acts of agents may bind the principal (31 Cyc. 1275). Corporations doing business within the state are required by law to file reports showing lists of officers, directors, stockholders, etc. Transportation and transmission companies doing business in this state are required, when directed to do so by the Corporation Commission, to make special reports and statements under oath concerning their business. Other similar state and federal laws requiring the giving of information which more seriously affects the corporation than would the giving of service letters to employes might be cited; and the validity of these laws has been upheld by the courts. A., T. & S. F. R. Co. v. State (No. 8162) 72 Oklahoma, 180 Pac. 849; I. C. C. v. Goodrich Transit Co., 224 U. S. 194, 56 L. Ed. 729, 32 Sup. Ct. 436.

We are unable to agree with the Supreme Court of Georgia in the case of Wallace v. Ga., C. & N. R. Co., 94 Ga. 732, 22 S. E. 579, the Supreme Court of Kansas in the case of A., T. & S. F. R. Co. v. Brown, 80 Kan. 312, 102 Pac. 459, 23 L. R. A. (N. S.) 247, 133 Am. St. Rep. 213, 18 Ann. Cas. 346, and the Supreme Court of Texas in the case of St. L. S. W. R. Co. v. Griffin, 106 Tex. 477, 171 S. W. 703, 705, L. R. A. 1917B, 1108.

The right of free speech guaranteed by the Constitution of the United States and the Constitutions of the various states does not include the absolute right to remain silent under all conditions and when doing so may injure the rights of others or the public. A corporation exists and does business within the state under and by virtue of the laws of the state. It is subject to such reasonable restrictions as the state may see fit to impose, and these restrictions may include the requirement to give information necessary to the public welfare. We hold that the giving of a service letter to employes discharged or leaving the service is the giving of information which concerns and affects the public welfare, and is a reasonable requirement which may be imposed by statute, as was done by the Legislature of Oklahoma.

We have not heretofore been called upon to construe the Service Letter Law, but in two instances we expressed our belief in its constitutionality. C., R. I. & P. R. Co. v. Hall, 60 Okla. 220, 159 Pac. 851, 853; St. L. & S. F. R. Co. et al. v. Fitzmartin, 39 Okla. 654, 666, 136 Pac. 764. We believe that the better reasoning favors the sustaining of this and similar legislation. We agree with the Su-

preme Court of Missouri in the case of Cheek v. Prudential Ins. Co., supra, and we feel that the conclusion we have reached is in line with the decisions recognizing the necessity for the protection of laborers. Holden v. Hardy, 169 U. S. 366, 391, 18 Sup. Ct. 383, 42 L. Ed. 780, 790; C., B. & Q. R. Co. v. McGuire, 219 U. S. 549, 566, 31 Sup. Ct. 259, 55 L. Ed. 328, 338; Erie R. Co. v. Williams, 233 U. S. 685, 34 Sup. Ct. 761, 58 L. Ed. 1155, 51 L. R. A. (N. S.) 1097.

The defendant's third specification of error is:

"The court erred in admitting incompetent, irrelevant, and immaterial testimony over the objections and exceptions of the defendant, and in excluding competent, relevant, and material testimony over the objections and exceptions of the defendant, although properly offered."

And his fourth specification of error is:

"The court erred in instructing the jury upon the question of damages, and was guilty of an abuse of discretion in overruling defendant's motion for new trial and sustaining the judgment for the amount of the verdict in favor of the plaintiff and against the defendant."

We will consider the third and fourth specifications of error together, and in doing so desire first to look to the issues joined in the pleadings and to the theory upon which the case was tried in the court below, and as to the character and nature of the testimony offered by the plaintiff and defendant upon the trial of the cause, and as to the instructions given to the jury by the court and those that were refused.

The plaintiff alleged in his petition by proper averment the fact of his employment by the railroad company and the duration of the period that he served the company in the capacity of switchman, the fact of his injury while in such employment and the circumstances surrounding it, as well as the nature of his injury, the settlement had with the company and that he was compensated for the same by the company, and that, when he had sufficiently recovered from the effects of the injury, he reported to the company for duty, as well as the fact of his dismissal from the service of the company, that he was refused re-employment, and that such re-employment was denied him, and that he asked for and obtained the service letter complained of, then charged the untruthfulness of the service letter, and that by reason of such untruthfulness of it he was blacklisted, and had never since been able to secure employment from any other railroad company in the capacity for which his experience had fitted him, and on account of same would be

forever precluded from obtaining employment for which he was fitted with any railroad company, and that at that time he had a life expectancy of slightly in excess of 20 years—all of which were, at least in some degree, supported by the testimony by the plaintiff, which, if believed by the jury, would entitle him to a verdict at the hands of the jury.

The testimony offered by the defendant upon the trial only contradicted the testimony of the defendant in part. The testimony of the defendant did not contradict the testimony of the plaintiff as to the fact of the employment of the plaintiff by the defendant, the fact of the duration and character of his services, nor the fact of the injury of the defendant or the circumstances surrounding such injury, nor that the railroad company compensated the plaintiff for such injuries, and the issuance and delivery to the defendant of the service letter, and that the statement contained in the service letter as to why the defendant was dismissed from the service of the railroad company was untrue, and, further, that the testimony offered by the defendant as to the grounds upon which the dismissal of the plaintiff from the service of the railroad company and its refusal to again employ him in the capacity shown all tended strongly in a negative way to establish the untruthfulness of the statement contained in the service letter as to why the plaintiff was dismissed from the service of the company, in that such testimony tended strongly to show that such dismissal from the service of the company and its refusal to again employ him were on account of his age and other physical conditions that rendered him inefficient, and that this was by competent testimony, and, in viewing the entire record, we are not prepared to say that the trial court did not err in receiving or rejecting testimony upon the trial of the case; yet such error was not, in our opinion, sufficiently grievous as to authorize a reversal of the case upon that ground.

We will next notice the specifications of error as to the instructions of the court upon the question of damages. The court's instructions were as follows:

(3) "You are instructed, gentlemen of the jury, that even though you should find from the evidence that the service letter does not state the true cause for discharge of the plaintiff from the service of the Chicago, Rock Island & Pacific Railway Company, nevertheless your verdict shall be for the defendant, unless you further find that the plaintiff has suffered damage by reason of his failure to obtain employment as a switchman on account of the statements in the service letter."

(4) "You are instructed that, before you can award any damages to the plaintiff, if any, the proof must show by a preponderance of the evidence: (1) That the contents of the said service letter was false; (2) that he was at the time he alleges he sustained the said damage a man of ordinary physical ability, able to perform the work of an average man in the line in which he was making application; and (3) that he was prevented from obtaining said employment for which he at that time was making application by reason of the statements contained in the alleged false service letter, which has been set out and introduced in evidence before you, and if you find and believe from the evidence that the contents of the said service letter were true, or that he was not a man of ordinary physical ability, able to perform the work of an ordinary individual in the line of employment in which he was making application for work or that he was not prevented from obtaining from the parties to whom said application was made by reason of the statements contained in the said service letter herein set out, you are instructed that the plaintiff has failed to prove his cause of action as alleged, and your verdict should be for the defendant."

(5) "You are instructed that, if the plaintiff was issued a service letter as alleged in the petition, and that said letter contained a statement relative to the reason for the plaintiff's dismissal, and said statement was untrue, and that because of the issuance of said letter containing said untrue statement said plaintiff has been denied employment by other railroad companies, then your verdict should be for the plaintiff in such sum as you find from the evidence he has been damaged as the direct and proximate result thereof."

Paragraphs 3 and 4 of the court's instructions were the defendant's requested instructions 5 and 7, and certainly the defendant is not in position to complain of the actions of the trial court in giving the same, and while we think they perhaps stated the law correctly, yet we think they were less favorable to the plaintiff than they were to the defendant; further, that instruction 5 was called for upon the sole issue of fact made by the pleadings and the evidence of both the plaintiff and defendant, and is a correct statement of the law upon such issue made; that there was competent evidence tending to support the verdict of the jury, and that there was no prejudicial error against the defendant committed by the court in admitting and rejecting testimony, and in giving and rejecting instructions to the jury, and that the defendant was not deprived of any constitutional or statutory right, and the court has repeatedly held that under such circumstances the verdict and judgment in the trial court will not be disturbed on appeal. Talla v. Anderson, 53 Okla. 418, 156 Pac. 670; Bartlesville Zinc Co. v. James, 66 Oklahoma, 166

Pac. 1054; Oklahoma City Land & Dev. Co. v. Adams Engineering Co., 51 Okla. 763, 155 Pac. 496; Parker v. Hamilton, 49 Okla. 693, 154 Pac. 65; Cox v. Kirkwood, 59 Okla. 183, 158 Pac. 930.

The judgment is affirmed.

All the Justices concur.