## ST. LOUIS & S. F. R. CO. v. ZALONDEK *et al.*

### No. 298.   Opinion Filed May 9, 1911.

1.   RAILROADS—Side Tracks—Powers of Corporation Commission. Same as the syllabus in St. Louis & San Francisco R. Co. v. State et al., 27 Okla. 424, 112 Pac. 980.

2.   SAME—Side Tracks for Cotton Gins. Section 33, article 9, of the Constitution of Oklahoma was intended to provide special facilities for such industry or plant, and not for the general public.

   (a) A cotton gin comes within the term "other industry" as used in said section.

3.   SAME—Extent of Railroad's Duty. Whenever the amount of business reasonably to be afforded a railway line by a gin plant is sufficient, after a switch or spur track has been constructed from said railroad to such plant at the expense of its owner, to justify the same, said railway company may be required to furnish switch stand and frog and other necessary material for making connections with such side track or spur under such reasonable terms, conditions and regulations as the Corporation Commission may prescribe.

4.   SAME—Construction of Statutes. Section 3 of act of May 20, 1908 (Sess. Laws 1907-08, c. 18, art. 2, p. 226; Comp. Laws 1909, art. 1, p. 422), was not intended to affect or limit section 33, art. 9 of the Constitution.

(Syllabus by the Court.)

*Appeal from Corporation Commission.*

From an order of the Corporation Commission in favor of A. A. Zalondek and others and against the St. Louis and San Francisco Railroad Company, the railroad company appeals. Reversed and remanded.

*A. F. Evans* and *R. A. Kleinschmidt*, for appellant.

*Chas. L. Moore,* (*Chas. West,* Atty. Gen., on the brief), Asst. Atty. Gen., for appellees.

WILLIAMS, J.   On August 26, 1910, the appellees petitioned the Corporation Commission to require the appellant to construct a side track to the cotton gin of A. A. Zalondek, situated at

South Cold Springs, and being located about one mile from the station or depot at Cold Springs; said gin also being off the right of way of the appellant a distance of forty or fifty feet. On the hearing on a former petition for the establishment of a depot the commission found as follows:

"It appears from the evidence adduced upon the hearing that citizens of Cold Springs and South Cold Springs are entitled to a better depot and shipping facilities; that it would be more convenient for a majority of the people in this vicinity to have the depot at the present location of defendant's station; and that although the advantages of this point are not shown to be greatly superior to those of the proposed location at South Cold Springs, proper depot and shipping facilities at Cold Springs will be sufficiently convenient to meet all the necessities of the people of South Cold Springs, and this location would not entail as great expense upon defendant as building a depot, moving side tracks and erecting stock pens at the other proposed location. It is further shown that additional side tracks and stock pens are necessary for the accommodation of the shippers of Cold Springs and vicinity, and that a great many more live stock would be shipped from that point if proper facilities were provided.

"It is therefore ordered by the commission, that the defendant, the St. Louis & San Francisco Railroad Company, build and construct at the location of the present station at Cold Springs, freight and passenger depot of a character and size that will properly meet the requirements of the citizens of Cold Springs and vicinity, and that it lay sufficient additional side tracks and build such stock pens as are necessary for the accommodation of shippers of live stock and other commodities that may be offered for shipment from that point. That plans and specifications for the depot herein ordered built shall be submitted to and approved by this commission. That said depot, additional side tracks, and stock pens shall be completed and ready for operation by September 1, 1909. That the same shall be maintained and operated thereafter until further orders of this commission."

Thereafter, on November 1, 1910, a supplemental petition to that filed on August 26, 1910, was filed by A. A. Zalondek, one of the appellees, setting forth that he had erected a cotton gin at South Cold Springs at an expense of $9,000, and praying

that the appellant be ordered to build a spur to said gin, claiming that it would be of great public benefit, not only enabling him but also other persons to handle cotton and other products at much less expense and would be a benefit not only to those shipping out cotton, but also to those desiring to ship cotton in for ginning. Upon the supplemental petition the following order was made:

"It is therefore ordered that the defendant, the St. Louis & San Francisco Railroad Company, establish and maintain a spur track from its main line to the gin of the defendant at South Cold Springs; the complainant to pay for the grading and ties and the defendant to furnish the steel and make the necessary connections: That this order shall be complied with and be in full force and effect on and after December 1, 1910."

The order entered upon the supplemental petition is assigned as error.

In *St. Louis & San Francisco R. Co. v. State et al.*, 27 Okla. 424, 112 Pac. 980, it was held that it was beyond the police power of a state to compel a railway company to put in switches at its own expense on the application of the owners of any elevator erected within a specified limit, and that section 18 of article 9 of the Constitution does not attempt to confer such power upon the Corporation Commission. In the opinion it is said:

"The foregoing case (*C., R. I. & P. Ry. Co. v. State et al.*, 23 Okla. 94, 99 Pac. 901), was followed in *A., T. & S. F. Ry. Co. v. State et al.*, 24 Okla. 616, 104 Pac. 908. Since handing down the opinions in those cases the Supreme Court of the United States in *Mo. Pac. Ry. Co. v. State of Nebraska*, 217 U. S. 196, 30 Sup. Ct. 461, 54 L. Ed. ——, has passed upon the power of the state of Nebraska to compel a railroad company to put in switches at its own expense on the application of owners of elevators erected within a specified limit under a statute which by its terms required them to do so. In that case it was held: 'It is beyond the police power of a state to compel a railroad company to put in switches at its own expense on the application of the owners of any elevator erected within a specified limit. It amounts to deprivation of property without due process of law; and so held as to the applications for such switches made by elevator companies in these cases under the statute of Nebraska requiring such

switch connections.' The question involved in the instant case has been passed upon several times by this court, and now that its decision thereon has been followed by the Supreme Court of the United States, we trust that the Corporation Commission will no longer consider it an open one, and will follow the rule laid down in the foregoing case in cases of that class that may hereafter come before it."

That an order requiring a switch track to be built to an industrial plant owned by private parties and not affected by a public interest, any portion of the expense of which is to be borne by the railroad company, is the taking of property without due process of law, is settled by the Supreme Court of the United States (*Mo. Pac. Ry. Co. v. Neb., supra.*), which is absolutely controlling, not only on this court, but also the Corporation Commission, as to such matters. The order complained of requires the appellant to furnish the steel rails and make the necessary connections at its own expense. This is clearly in the face of said decisions, and erroneous. The expense or cost of the rails cannot be required to be borne by the appellant, but must be paid by the owner of the gin plant. Section 33 of article 9 of the Constitution is as follows:

"Any person, firm or corporation, owning or operating any coal, lead, iron, or zinc mine, or any saw mill, grain elevator, or other industry, whenever the commission shall reasonably determine that the amount of business is sufficient to justify the same, near or within a reasonable distance of any track, may, at the expense of such person, firms, or corporation, build and keep in repair a switch leading from such railroad to such mine, saw mill, elevator or other industry; such railroad company shall be required to furnish the switch stand and frog and other necessary material for making connections with such side track or spur under such reasonable terms, conditions and regulations as the said commission may prescribe, and shall make connection therewith. The party owning such mine, saw mill, elevator or other industry shall pay the actual cost thereof. If any railroad company, after proper demand therefor is made, shall refuse to furnish said material for making said connection and put the same in place, or after the building of such switch, shall fail or refuse to operate the same, such railroad company failing and refusing for a reasonable time, shall forfeit and pay to the party or corporation aggrieved, the sum of five hundred dollars for each and

every offense, to be recovered by civil action in any court of competent jurisdiction; and every day of such refusal on the part of the railroad company to operate such switch as aforesaid, after such demand is made, shall be deemed a separate offense."

The railroad company may be "required to furnish the switch stand and frog and other necessary material for making connection for such side track or spur, under such reasonable terms, conditions and regulations as said commission may prescribe, and shall make connection therewith." Obviously it was intended for the railroad company to retain the ownership and control of such switch stands and frogs and other necessary material for making connection with such side tracks or spurs. Reasonable terms, conditions, and regulations as to the use and operation of the same by the railway company are to be prescribed by the commission so that the railway company shall receive a just compensation therefor. As to whether such just compensation may be included in the freight rate, we do not now consider. The operating of such switch by such railway company for such private plant contemplates only the setting in and taking out of carload shipments or lots to and from such plants, and not the delivery of local freight in parts of cars, for, in such event, that would require the maintenance of an agent at such plant, which is not within the purview of this section.

Section 33 seems to have been taken from section 1119, Annotated Statutes of Missouri, 1906, at page 969 (Rev. Stat. Mo. 1889, sec. 2323). This section is construed in *St. Louis, Oak Hill & Carondelet Ry. Co. v. Fowler et al.*, 142 Mo. 670, 44 S. W. 771, wherein it is said:

"At the time of the trial, under the provisions of this statute, the owner of the remaining land, who should establish an industry thereon, in which the amount of business is sufficient to justify the same, has the right to switch connections, which the company is bound to provide and operate. The duty imposed upon the company by the statute is as obligatory upon it as a personal covenant to furnish such facilities would be  * * *  Switching privileges, such as are required by the statute to be provided, are only of advantage to those who own land 'near or within a reasonable distance of the railroad.' The benefits are not common to

all the land in the community generally, but are special to the land which is so situated that they can be used."

This provision was intended to provide special facilities to such industrial plants, and not for the benefit of the general public or community.

It is insisted by appellant, however, that a cotton gin does not come within the scope of "other industry," and that therefore the owner of said gin plant is not entitled to have the "switch stand and frog and other necessary material for making connections with such side track or spur under such reasonable terms, conditions and regulations as said commission may prescribe and shall make connection therewith." This provision should be given a reasonable construction with a view of accomplishing the ends intended by the framers of the Constitution and not narrowed by a technical view. A saw mill is an industry; it manufactures lumber out of logs. A gin, likewise, is an industrial plant; it manufactures lint cotton out of seed cotton. The necessity for a switch or spur to a saw mill may be solely for the shipment of the manufactured products to the markets, and not for the shipment of logs from the forests to the mill. For frequently the logs are hauled by the log wagon and ox teams, as was the custom with the pioneers. Lint cotton is not the sole product from the gin. For from the seed cotton, after it goes through the ginning process, flows not only the lint, but also the seed, a valuable product of commerce. In order for the seed to be reasonably utilized they must be shipped from the gin plant to the oil mills, where it may be converted into hulls, meal, oil, etc. If appellant's contention as to the proper construction is correct, cotton compresses and cotton oil mills do not come within the term "other industry." It would be strange, indeed, if the framers of the Constitution intended to omit such plants or industries from the scope of sections 33, for cotton was, and is, one of the principal agricultural products of the state. The compressing of same into bales and the manufacture of the seed into meal and hulls and oil were also principal industries at said time. In order for such plants, the

construction of which involves the investment of thousands upon thousands of dollars, to be reasonably operated, spurs, switches, or side tracks thereto are required. In fact, such was the practice at that time. Saw mills, grain elevators, coal, iron, lead and zinc mines are plants, which, when operated, reasonably require side tracks, switches, or spur tracks constructed thereto, in order for the output to be transferred to the adjacent railroads, that the same may be transported to the markets of the world. Cotton gin plants, cotton oil mills, and cotton compresses are alike in that respect, and therefore come within such class. Therefore we conclude that a cotton gin is covered by the term "other industry," and that the Corporation Commission is empowered by section 33, article 9, whenever the amount of business afforded appellant's line by such gin plant is sufficient to justify, after such switch or spur track has been constructed at the expense of the owner of said gin plant, the furnishing of a switch stand and frog, and other necessary material for making connections with such side track or spur, to require same to be furnished under such reasonable terms, conditions, and regulations as the said commission may prescribe.

The first Legislature of this state passed an act "to extend the jurisdiction of the Corporation Commission over all matters of physical connection, union depots, and sufficient transfer and switching facilities of the different railroads in the State of Oklahoma, and requiring all railroad companies to make and maintain physical connections, transfers, switching facilities, and union depots in the state of Oklahoma." (Session Laws 1907-08, c .18, art. 2, p. 226; Comp. Laws 1909, c. 19, art. 1, p. 422.) Said act was approved on May 20, 1908, and having become effective prior to the second Monday in January, 1909 (sec. 35, art. 9, of the Const.), may not operate so as to alter, amend, revise, or repeal any of the provisions of article 9 of the Constitution. Said act can only be in effect in so far as it may be supplementary to the provision of said article.

Section 1 of said act provides:

"That every railroad company operating a railroad in this state shall make such physical connections, transfers and switching facilities at all *junction points* and at all *incorporated towns* where one or more railroads enter or are included in said town, as may be ordered and directed by the Corporation Commission; Provided, that the Corporation Commission is also hereby authorized, when the public interests can be promoted, to require physical connections between two or more lines of railways, when the same is practicable, regardless of whether the roads cross one another or not."

Section 2 provides:

"The Corporation Commission shall have full power, and it shall be the duty of said commission to investigate all complaints in reference to the physical connections, transfers, depots, switching facilities at all *junction points* and *incorporated towns,* villages and communities, and upon investigation of said complaint or upon its own motion the said commission may require any railway companies to make such physical connections or to establish and maintain union depots, transfer and switching facilities as the public interests may require; Provided, however, the Corporation Commission may make its order requiring such physical connections, transfer and switching facilities in any *incorporated town* on condition that such necessary additional rights-of-way therefor be furnished the railroad company making such physical connections free, or at such reasonable cost as in the judgment of the commission may be fair and reasonable to the people and such companies."

Section 3 also provides:

"The expenses incurred in the construction and maintenance of the physical connections, union depots, transfer and switching facilities mentioned in the preceding sections of this act shall be borne by the companies operating the different lines of railroad as such companies may agree, and in case of disagreement the Corporation Commission shall determine the expense to be borne by each, from which order the railroad company or companies may appeal, as in other cases provided."

If section 3 includes spurs or switches to private industries it would be in conflict with section 33, article 9, of the Constitution, and by the limitation of section 35 of said article, it having been

passed prior to the second Monday in January, 1909, it would to that· extent be void. But said section seems to apply only to sections 1 and 2 of the same act, which refers to physical connections, transfer and switching facilities as the *public*.interests may require, and the switch or spur provided for in section 33 of article 9 is not contemplated to be put in on account of the demands of the *public*, or as the *public interests may require*, but for the benefit of private industries. Section 3, if construed to apply to such plants, would be violative of the 14th amendment of the federal Constitution under the holding in the recent case of the *Missouri Pacific R. Co. v. The State of Nebraska*, 217 U. S. 196, 30 Sup. Ct. 461, 54 L. Ed. ——.

It is a well-settled rule of construction that when a provision is reasonably susceptible of two constructions, one of which would render same invalid, and the other valid, the latter will be adopted. This cause is reversed and remanded, with instructions to proceed under the rules of law herein announced.

All the Justices concur.