## CHICAGO, R. I. & P. R. CO. v. STATE et al.

No. 12182—Opinion Filed Oct. 4, 1921.

(Syllabus.)

1. **Railroads—Industrial Switches—Farm as "Industry."**

Under section 33 of art. 9 of the Constitution of Oklahoma a farm may come within the term "other industry."

**2. Same — Business to Justify Switch — Power of Corporation Commission.**

Under said section of the Constitution the Corporation Commission is not justified in issuing an order to require a railway company to maintain a switch for the benefit of any person, firm, or corporation, owning or operating any coal, lead, iron or zinc mine, or any sawmill, grain elevator or other industry, unless it appears from the showing made that the amount of business produced by such mine, sawmill, elevator or other industry is sufficient to justify the same.

**3. Corporation Commission — Orders—Presumption of Reasonableness.**

The prima facie presumption of the reasonableness, justness, and correctness of an order of the Corporation Commission, obtaining by reason of section 22, art. 9, of the Constitution, applies only to the facts found by the Commission, or established by evidence upon which the Commission failed to make a finding; and, where a fact material to the reasonableness, justness, and correctness of an order is lacking in the finding of facts made by the Commission, and is not supplied by the evidence, the presumption obtaining by reason of said section does not apply, and on review in this court such order cannot be sustained.

**4. Railroads—Industrial Switch for Farm—Order—Sufficiency of Evidence.**

The evidence in this case examined, and held it fails to show that the amount of business which would be produced is sufficient to justify maintaining the switch.

**5. Same—Temporary Switch — Right of Railroad to Remove.**

When a person seeking to have a switch put in by a railway company for his benefit accepts the terms of a letter in writing that he will pay a certain amount of the expense incurred in installing such switch, under the terms of the letter, which clearly states that the switch is temporary and shall be removed in six months, no equity arises in his favor to compel the railway company to continue to maintain such switch after the expiration of the time for which it was installed, because of the expenditure of money made by such person.

Appeal from Order of Corporation Commission.

From order of Corporation Commission requiring the Chicago, Rock Island & Pacific Railway Company, upon complaint of Fred A. Chapman, to re-install a switch, the railway company appeals. Reversed.

C. O. Blake, W. R. Bleakmore, R. A. Tolbert, Roy St. Louis, and E. P. Kelly, for plaintiff in error.

E. S. Ratliff, E. C. Patton, and A. I. Thompson, for defendants in error.

MILLER, J. A complaint was filed by Fred A. Chapman against the Chicago, Rock Island & Pacific Railway Company before the Corporation Commission asking that the railway company be required to install or replace a switch between Mannsville and Russett, Oklahoma. A hearing was had before the Corporation Commission; and it made an order requiring the railway company to replace the switch. The railway company appealed from the ruling of the Corporation Commission, and appears here as appellant. It assigns several specifications of error, which it will not be necessary to set out in full. The complaint and order read as follows:

"The complainant says: Cause No. 3992.

"1. (State name, address and occupation) Fred A. Chapman.

"2. That the above named defendant is a common carrier in the state of Oklahoma, and that as such is subject to the laws of the state of Oklahoma relating to railway and transportation companies.

"3. (Grounds of Complaint) That said C., R. I. & P. Railway Company on or about the first day of July, without notice to affiant, undertook and started work of removing certain spur track known as Chapman Spur, between the towns of Mannsville and Russett, Oklahoma, on the Chapman farm; said switch or spur being about 340 feet in length and being used for shipping of cordwood and farm products; said spur and track having partly been constructed by this complainant, and complainant having paid said C., R. I. & P. Railway Company the sum of $350.00 for installing same at that location; that said spur at said location is necessary to the complainant and others in that vicinity for purpose of loading cordwood and other commodities of said vicinity.

"Wherefore the complainant prays that the aforesaid defendant be required to answer the charges herein and after due hearing and investigation an order be made commanding—and for such other and further order as the Commission may deem necessary and just.

"Dated at Oklahoma City this 2 day of July, 1920.

"Fred A. Chapman,
"Complainant.

"Cause No. 3992    Order No. 1816.

"On the 2nd day of July, 1920, complainant filed his complaint with this Commission, in which he alleges that the respondent railway company was removing and tearing away a certain spur track, known as Chapman Spur, located between the stations of Russett and Mannsville, Oklahoma, at mile post No. 95.

"That said spur was located and installed at said point in January, 1920. That com-

plainant furnished men and teams and graded the roadbed for said spur, which required some 15 days' work with six or eight teams and several men, and that it paid the actual costs of laying said track: to wit, the sum of $350.00. That said spur was necessary and essential to petitioner and his renters and neighbors for loading out cordwood, alfalfa hay, sweet potatoes and other farm products of the vicinity.

"Respondent defends by alleging that said spur was located and installed under the terms of a written contract as an emergency, and was to remain only for a period of six months, at which time same was to be removed.

"At the hearing, on the 12th day of July, 1920, all parties being present and represented by counsel, the evidence submitted shows that the spur was installed by the company under the terms of a written contract for a period of six months. That complainant owns some four or five thousand acres of land at and near said spur; 1,500 acres of which is in cultivation. That he has cleared within the past year some 150 acres of timber land, and is now clearing and proposes to clear 1,600 acres more, the wood from which he proposes to ship out, loading same at said spur. That the shipment of wood has already amounted to some six or seven hundred cords with about two hundred cords now ready for shipment. That there was moved in and out of said spur of various farm products, some fifty cars annually.

"The testimony shows that the wood now being cleared from said lands would never reach a market other than over this spur, as cost of haulage by wagon over the roads to either Russett or Mannsville, is prohibitive. The evidence shows that it costs five dollars per cord to transport same by wagon to either railway station. The railway company's testimony was that said spur would interfere with operation of its trains in handling the shipments loaded at said spur, and that the handling of cars loaded at said spur would add to the expense as well as the hazard of the operation of its trains.

"From all the testimony at hand, the Commission finds that said spur was located and installed under the contract between the complainant and respondent, under the terms of which same was to be removed at the expiration of six months: but further finds that the locating and removing of an equipment of this nature, is not altogether a matter of private contract, and that if reasonable necessity exists for said spur remaining at such location, the company would have no authority to remove same without the approval of this Commission.

"That said spur is located at a point 2.4 miles from Mannsville station, and 3 miles from Russett station. That the dirt road from said spur, and the point from which

the wood and farm products from said spur and neighborhood to either railway station, is in such shape and conditon as to not permit of successful and economical use of hauling heavy loads. That the grade at the point where said spur is located is 0. That while the necessity for said spur is not so great from the standpont of fuel supply as at the time of its installation, yet in all probability there will be demands for the wood during the coming winter. That the complainant paid the costs of laying and grading said spur, and in a manner complied with the requirements set forth by the provisions of section 33, article 9, of the Constitution of the state of Oklahoma. That there is sufficient demand and necessity for said spur to justify the railway company in allowing same to remain.

"It is therefore the order of the Commission, it being advised in the premises, that respondent, the Chicago, Rock Island & Pacfic Ry. Co., immediately re-install and re-build what is known as the Chapman Spur, located 2.4 miles from Mannsville and 3 miles from Russett, on the Ardmore branch of the C., R. I. & P. and the spur to remain in service until further ordered by this Commission.

. "Done at Oklahoma City this 7 day of December, 1920.

(Seal) Corporation Commission of Oklahoma.

"Art. L. Walker, Chairman.

"Campbell Russell, Comm'r.

"Attest:

"P. E. Glenn, Act. Sec'y."

The evidence shows the switch was installed by the railway company upon the acceptance by Chapman of the terms of a letter, which is as follows:

"Subject:

"Tracks—MP 95-14 and 95-15—Fred A. Chapman.

"Haileyville, Okla., Dec. 5, 1919.

"File 376-A

"Mr. Fred A. Chapman,

"Ardmore, Oklahoma.

"Dear Sir.—

"We are authorized to construct the temporary spur between MP 95-14 and 95-15 or at about that location on our Ardmore branch to permit you to load out the 1,200 to 1,500 cords of wood which you now have on the ground at or near that place, provided you deposit with us a certified check in the amount of $350.00, which is the amount we estimate it will cost for labor to construct this siding and remove it again after the loading had been completed.

"It is, of course, understood that if the expense should exceed that amount you will also pay the difference. On the other hand if all of this money is not required for constructing and later removing this spur the difference will be refunded to you.

"It is further understood that this track is purely temporary and is to be removed after the present supply of wood has been loaded out and in any case not later than June 1, 1920. This track to be of sufficient length to hold ten cars and that you will promptly load the cars when placed thereon.

"It is further understood that the rate on this wood shall be the regular tariff rate from the nearest station.

"As evidence of your agreement to these conditions, please sign two copies of this letter, deliver them to our agent with the certified check referred to and retain the third copy of this letter.

"We are prepared to act promptly in the construction of this track.

"Yours truly,

"(Signed)   D. Van Hecke,

"Superintendent."

At the hearing, which was had July 12, 1920, Mr. Chapman was the only person who testified on behalf of the complainant, and his testimony in substance is as follows: He owns between four and five thousand acres of land extending from one-half (½) mile east of Russett to one-half (½) mile west of Chapman switch. He has owned this land two or three years. The headquarters and feed grounds of this tract of land are near where Chapman switch was located. He had about 200 cords of wood at the switch, and estimates he will ship from 16 to 20 carloads of hay; from 15 to 30 carloads of sweet potatoes; he expects to have from 700 to 1,000 acres of corn, which he estimates will make from 40 bushels to 75 bushels per acre, and will ship 8 or 10 carloads of corn; he will raise small grain, if he has the switch, and this would make from 4 to 6 carloads; he will ship out from 500 to 1,000 head of cattle and will ship from 5 to 15 carloads of hogs a year. Taking this year as an example, he would ship in 10 to 12 carloads of building material a year, and he estimates that with the spur track or switch in, the total number of cars shipped would not be less than 50 or not very far from 100, and by using the rough estimate he had made, it would be 200 cars.

D. Van Hecke testified in behalf of the railway company as follows:

"I am the superintendent of the Rock Island Railroads at Haileyville, Oklahoma, and was located there during the time this application for the track was made and its construction, etc. My first information regarding it was contained in a telegram from our agent at Ardmore on December 2nd, 1919, which stated that Mr. Chapman had asked him what steps he could take to get a switch put in between two certain mile posts, saying that he would pay all expenses and that all he wanted was a section man to put in the switch and supervise the other work; that he would furnish men to do the work in two or three days. I replied to that advising him to put his propostiion in writing to the traffic department representative, Pat Purtell (?) located at Oklahoma City. Then, through a personal call from Mr. Chapman I learned more in detail as to just what he wanted and why he wanted it and it was represented that, as a result of the coal miners' strike from November 1st to December 15th, that there was a great shortage of fuel in the country and that they were unable to catch up on the supply of coal and that there was a very strong demand for wood; that he had between 1,200 and 1,500 cords of wood on hand which I say that I knew he had considerable wood on hand but that was his figures, and I advised Mr. Warner (?), or manager at El Reno, who was the superior officer to me to whom those things are referred by me that Mr. Chapman wanted a permanent siding established, that I told him I didn't favor a permanent siding there, as it was only about three miles to a station; that he was willing to pay the expenses of putting down and taking up a temporary siding to permit him to ship this wood as an alternative against having a work train or a train to remain out there with the cars while they were being loaded. I said there would be close to 100 carloads basing it on the amount of wood Mr. Chapman advised me he had: that it would go to Ardmore Tishomingo, Oklahoma City and western Oklahoma points and that quick action was necessary. I received a reply from Mr. Warner December 3rd, saying that I should secure written agreement with Fred A. Chapman, that he will pay the entire expense of laying temporary track and taking same up, and he will agree that track was only to lay in place not to exceed six months from date constructed, you may proceed with the work, etc. That information was communicated to Mr. Chapman through our agent at Ardmore. The engineering department provided me with an estimate of the expense of constructing and taking up that track, which was $346.50. As a result of the reply received through the agent at Ardmore, which I presume he obtained from Mr. Chapman, this written agreement that has been referred to was prepared and Mr. Chapman signed and returned two copies of it with a certified check for the $350 and the track was constructed. There was shipped from that track 20 carloads of wood and there was shipped into that track during the time that it was there five carloads of freight, one of iron, one of spuds and three of posts. Before taking up the track recently, I wrote to Mr. Chapman asking him if he had completed the shipments for which the track was constructed, and then received quite a lengthy letter from him protesting against

its removal and outlining at considerable length the necessity for its remaining there permanently, which was the first I had ever heard or known of any intention or understanding or idea that that should be a permanent track. Again, before finally taking it up I received instructions from our officials to do so, which action was exactly in accord with the agreement which had been entered into. I will say, furthermore, as stated in the first part of my statement, that Mr. Chapman indicated that he desired a permanent track there, I told him I didn't favor it and it was against our policy, and gave him several reasons for it; first, the fact that it was very near a station on either side; second, the fact that it was not only expensive but dangerous from an operating standpoint to stop trains out in the country between stations, as it was necessary for men to go and protect them by a flag and that this siding was on a hillside in any direction; that it would be difficult for a heavy train to start from there and that our water stations were a long way apart, and for trains to stop for any considerable length of time it might be necessary to run for water, all of which would increase the hazard and expense of operation. Furthermore, that it was a spur track and that we had to make a flying switch of these cars setting them in or taking them up. I think Mr. Chapman will agree we were very diligent to furnish cars after the track was constructed. I told the conductors that we wanted that moved as quickly as possible and furthermore that there was an urgent demand for this wood, and we were serving the purpose of the consumers by getting it out of there as quickly as possible."

The evidence further shows that complainant had been trying approximately two years to get a switch installed at this point and had failed. Someone suggested to him that he use the emergency method on account of the shortage of fuel, and if he got it installed temporarily it would eventually become permanent. He did not get this information from anyone with authority to speak for the railway company. The terms contained in the letter which he accepted were plain and unambiguous. It stated positively that the switch was to be only temporary; that it would be removed in six months. He paid out his money on this express agreement; therefore, he is not in a position to complain about the expense he incurred in installing it.

Notwithstanding the right of the Corporation Commission to ignore contracts in fixing rates, etc., we still maintain a wholesome respect for these obligations when fairly made and the public is not injured by such contracts. Section 10 of art. 1 of the Constitution of the United States reads in part: "No state shall pass any law impairing the obligations of contracts." We believe that is a wholesome provision; the framers of that provision were wise even beyond their day and generation. A just application of that provision by all commissions and courts will have a salutary effect on the integrity of the citizenship and stability of commercial relations.

Mr. Chapman contends that under section 33, art. 9, of the Constitution, he is entitled to this switch. The section reads as follows:

"Any person, firm, or corporation owning or operating any coal, lead, iron, or zinc mine or any sawmill, grain elevator, or other industry, whenever the Commission shall reasonably determine that the amount of business is sufficient to justify the same, near or within a reasonable distance of any track, may, at the expense of such person, firm, or corporation, build and keep in repair a switch leading from such railroad to such mine, sawmill, elevator or other industry; such railroad company shall be required to furnish the switch stand and frog and other necessary material for making connection, with such sidetrack or spur under such reasonable terms, conditions and regulations as the said Commission may prescribe, and shall make connection therewith. The party owning such mine, sawmill, elevator or other industry shall pay the actual cost thereof. If any railroad company, after proper demand therefor is made, shall refuse to furnish said material for making said connection and put the same in place or after the building of such switch, shall fail or refuse to operate the same, such railroad company failing and refusing for a reasonable time, shall forfeit and pay to the party or corporation aggrieved, the sum of five hundred dollars for each and every offense, to be recovered by civil action in any court of competent jurisdiction; and every day of such refusal on the part of the railroad company to operate such switch as aforesaid, after such demand is made, shall be deemed a separate offense." (Bunn's Ed. sec. 246.)

Mr. Chapman insists that a farm comes within the class designated as "other industry." Webster's New International Dictionary defines "industry" as follows:

"Any department or branch of art, occupation, or business; esp., one which employs much labor and capital and is a distinct branch of trade; as the sugar industry; the iron industry; the cotton industry; agricultural industries."

Under this definition farming or agricultural pursuits are an industry. If an industry, it is a different or "other industry" from those already specifically named. However, it may not always be defined in the abstract, but depends partly on the degree. Agriculture is a distinct branch of the industries of

this state. In the aggregate a large amount of labor and capital is employed. The framers of the Constitution used it in the relative rather than in the abstract.

The Supreme Court of Montana, in the case of Carver Mercantile Co. v. Hulme, 19 Pac. 213, held:

" 'Industry' is defined by lexicographers to be 'habitual diligence in any employment, either bodily or mental'; and 'industrial' as consisting in or pertaining to industry. These definitions are surely as applicable to the sale of goods, which is the chief business of a merchant, as to the transportation of the goods, which is the chief business of the express carrier. They are alike 'industrial,' and if the Legislature could authorize the formation of a corporation for one of these purpose, it could for the other."

The United States Circuit Court of the District of Oregon, 23 Fed. 469, 10 Sawyer, 441, held:

"Rev. Statutes, section 1889, provides that the legislative assemblies of the several territories shall not grant private charters or special privileges, but they may, by general incorporation acts, permit persons to associate themselves together as bodies corporate for mining, manufacture and other industrial pursuits, etc.; and it was objected that Wells Fargo & Co., a corporation organized by a special act of the territory of Colorado and authorized to engage in the express business, could not come into Washington Territory to do business there, because it was not a corporation engaged in an industrial pursuit, or at least not engaged in such an industrial pursuit as mining or manufacturing; and hence the Legislature of Colorado had no autority under such act of Congress, to grant to such corporation a charter. 'Industrial' is a very large word, and although it is associated with the words 'mining' and 'manufacturing,' it would be contrary to the manifest purpose of Congress to so restrain it as that the pursuit must be literally, or almost literally, a mining one or a manufacturing one. The express business is an industrial pursuit, and one which the territorial Legislature could provide for the formation of corporations to engage in." (See Words and Phrases, vol. 4, page 3570.)

In the case of Bashford-Burmister Co. v. Agua Fria Copper Co., 35 Pac. 983, the Supreme Court of the state of Arizona held:

"But it is evident that the territorial act is not in conflict with said section 1889, Rev. St. U. S. The term 'industrial pursuit,' for which the Legislature may authorize corporations to be formed, is a very broad expression. For instance, it was decided by Judge Deady in Wells, Fargo & Co. v. Northern Pac. R. Co., 23 Fed. 469 that the express business was 'an industrial pursuit,' within the meaning of that term. Just why the sale of goods, mining supplies, etc., should be less

'industrial' than the express business would, in our opinion, be difficult to maintain."

A railroad company cannot be required to install a switch for a coal, lead, iron, or zinc mine until the Corporation Commission shall first determine that the amount of business produced at such mine is sufficient to justify the same. To come within the class of "other industry" as used in this section of the Constitution, a farm would have to meet the same requirements as a mine. It must produce a sufficient amount of business to justify the same.

In the case of St. Louis & S. F. R. R. Co. v. Zalondek et al., 28 Okla. 746, 115 Pac. 867, the court held:

"Section 33, article 9 of the Constitution of Oklahoma, was intended to provide special facilities for such industry or plant, and for the general public.

"Whenever the amount of business reasonably to be afforded a railway line by a gin plant is sufficient, after a switch or spur track has been constructed from said railroad to such plant at the expense of its owner, to justify the same, said railway company may be required to furnish switch stand and frog and other necessary material for making connections with such sidetrack or spur under such reasonable terms, conditions, and regulations as the Corporation Commission may prescribe."

In the case of St. Louis & S. F. R. Co. v. Newell et al., 25 Okla. 502, 106 Pac. 818, in a very able opinion by Hayes, J., this court laid down the following rules in the syllabus:

"The prima facie presumption of the reasonableness, justness, and correctness of an order of the Corporation Commission, obtaining by reason of section 22, art. 9 of the Constitution, applies only to the facts found by the Commission, or established by evidence upon which the Commission failed to make a finding; and, where a fact material to the reasonableness, justness, and correctness of an order is lacking in the finding of facts made by the Commission, and is not supplied by the evidence, the presumption obtaining by reason of said section does not apply, and on review in this court such order cannot be sustained.

"An order of the Corporation Commission, requiring a railroad company to install telegraph service at one of its stations for the sole purpose of bulletining its passenger trains, made without any findings of fact or evidence as to the extent of the passenger traffic at said station, or the amount or approximate amount of the receipts therefrom, held, error, where it was shown that such additional service would require an increase in the expenses of the company for maintenance of the station of from 75 to 100 per cent."

The only findings of fact by the Corporation Commission are that the spur was in-

stalled under the contract by the terms of which it was to be removed at the expiration of six months. That the spur was located two and one-fourth miles from Mannsville and three miles from Russett. That the dirt road from said spur to either railway station above mentioned is in bad condition. That the grade at the point where said spur is located is 0. That the complainant paid the cost of laying and grading said spur. That there is a sufficient demand and necessity for said spur to justify the railway company to allow the same to remain. These findings of fact are all supported by the evidence, except the last one. The evidence failed to disclose the amount of tonnage or the amount of money received by the railway company for the 25 cars of freight that were handled at this switch. It is probable that the railway company would not have installed the switch had it known only 20 cars of wood would be loaded. Mr. Chapman obtained this concession from the railway company on his representation that he had from twelve to fifteen hundred cords of wood. That is the amount set out in the letter which he signed accepting its terms. He said in his testimony the average carload of wood is sixteen cords. According to the representation he made to the company to obtain this concession, he would have had approximately 90 cars of wood, whereas he had only 20 cars of wood. This would be approximately 360 cords. His evidence at the hearing was that they were then cutting wood and had approximately 200 cords cut. This indicates he had shipped out practically all of the wood he had on hand when the switch was installed. His evidence of the number of cars he would ship out is all speculative, conjectural, and much of it highly improbable. He estimates the number of bushels of corn he would raise, the amount of hay he would put up, the number of hogs and cattle he would feed, and the number of cars it would require to ship out these various commodities. In feeding the number of hogs and cattle he estimated, he would use practically all of the corn and hay he estimated he would raise, and there would be none of that to ship out. His land extends from the switch on the east to one-half mile beyond Russett. Part of his products would be grown nearer Russett than the switch. The sandy roads he testified to would not be any serious inconvenience in shipping out his cattle from either Russett or Mannsville.

Viewed in its most favorable light, we do not think the evidence is sufficent to sustain the order of the Corporation Commission. It does not meet the requirement laid down in St. Louis & S. F. R. Co. v. Newell, supra.

It has been a year since the testimony was taken and more than six months since the order was made by the Corporation Commission. If complainant's estimate of the amount of freight he expected to ship has materialized, he can ask the Corporation Commission to make a further investigation, and then show how many cars complainant has actually shipped, either in or out of Russett or Mannsville from July 1, 1920, until the date of the hearing, and what the tonnage and freight charges amounted to. If the amount is sufficient to justify the installing of the switch the Corporation Commission can then make its order under section 33 of article 9 of the Constitution.

The order of the Corporation Commission is hereby vacated and set aside.

All the Justices concur. except PITCHFORD, V. C. J., and KANE, J., not participating.