### PHELPS et al. v. CHILDERS, State Auditor, et al.

No. 28853. Feb. 11, 1939.

Rehearing Denied March 11, 1939.

James I. Phelps, N. S. Corn, and Thomas L. Gibson, in pro. per.

Samuel O. Neff, of Oklahoma City, for plaintiffs.

Mac Q. Williams, Atty. Gen., and John H. Poe, and Randell S. Cobb, Assts. Atty. Gen., for defendants.

CARGILL, Special Justice. This is an original action filed by the plaintiffs, Justices of the Supreme Court of Oklahoma, elected to such office on November 6, 1934, seeking to compel, by mandamus, the defendant C. C. Childers, State Auditor, and Hubert Bolen, State Treasurer, to approve and pay their several claims for services performed in compliance with the provisions of House Bill 239, Session Laws 1936-37, page 33, which became effective August 10, 1937. Since the filing of this action Frank Carter has become State Auditor and Carl Sebring State Treasurer. On motion they have been substituted as defendants.

The three Justices concerned have entered their disqualifications, the remaining regular members of the court have recused themselves, and the Governor has appointed the present nine special Justices to hear the case.

Plaintiffs plead their election to office, their written acceptance and agreement to perform the services as called for in the act, the performance of such service, the filing of verified claims covering the same, and the action of the State Auditor disallowing the same. An alternative writ of mandamus issued in usual course.

The defendants' answer and amendment thereto admits all the matter pleaded save the performance of the services and alleges the act violates section 10, art. 23, Oklahoma Constitution, in that the real purpose, intent, and motive of the Legislature in passing it was to unconstitutionally increase the salary and emolument of the offices of the plaintiffs.

The bill provides for the revision and compilation of the civil, probate, and appellate statutes of this state, recites the necessity of such revision, directs the Justices of this court elected in November, 1934, upon their written acceptance of the terms of the act filed with the Secretary of the State, to perform such service, fixes the compensation for such service at $2,500 annually, payable monthly, requires the work as and when completed to be filed in the State Library, and that the work must be completed by the second Monday in January, 1941. The amended answer pleads that the act also violates section 1, art. 4, and sections 32, 51 and 59, art. 5, Oklahoma Constitution, and a denial of the performance of the service by plaintiffs. We shall treat the questions raised in the order presented.

This court is composed of nine Justices. When the act was passed the salaries of six of the Justices was fixed at $7,500 per year (section 3481, O. S. 1931, S. L. 1936-7, p. 7). The salary of the three embraced in the act was fixed at $5,000 per year under chapter 138, S. L. 1933. Every two years three Justices of this court are elected to a six-year term. The official duties of the several Justices are the same. This unusual and unequal situation gives rise to the Attorney General's primary assault upon the act. He contends the controlling motive in passing the act was to unconstitutionally increase the salary and remuneration of the plaintiffs, in violation of section 10, art. 23, which prohibits increasing the salary or emolument of any public officer by an act passed after his selection and during the term he was selected to serve. Our Legislature, unlike the national Congress, is entrusted with general authority to make laws at its discretion, subject only to restrictions found in the state and federal Constitutions.

State ex rel. Caldwell v. Hooker, 22 Okla. 712, 98 P. 964:

"It is not within the province of the judiciary to question the wisdom or motives

of the lawmaking body in the enactment of a statute." (State v. Johnson, 90 Okla. 21, 215 P. 945; Sheldon v. Grand River Dam Authority, 182 Okla. 24, 76 P.2d 355.)

As was well stated in Commonwealth v. Moir, 199 Pa. 534, 49 Atl. 351, 53 L. R. A. 837, 85 Am. St. Rep. 801, a similar case:

"It ought not to be necessary to restate principles so fundamental, nor to cite authorities so familiar and so long established. But the range of the argument, and the energy with which it was pressed, have seemed to make it proper to set forth clearly the only question before the court, the constitutionality of the statute in question. Much of the argument and nearly all of the specific objections advanced are to the wisdom and propriety and the justice of the act, and the motives supposed to have inspired its passage. With these we have nothing to do. They are beyond our province, and are considerations to be addressed solely to the Legislature."

In the case of John L. Love, Attorney General, v. Baehr, 47 Cal. 364, the Supreme Court of California in passing upon a very similar act held:

"It is true, as suggested by counsel, that the Legislature might abuse its trust, and perhaps partially evade the constitutional prohibition by contracting with these officers for the performance of trivial, nonofficial services, at an exorbitant compensation. But all legislative power is subject to abuse; and under our form of government, the only remedy is to be found at the ballot box."

Any other rule would permit the courts to hear evidence tending to establish the motive of the Legislature in passing any statute and place the very existence of the law upon a controverted question of fact.

Courts may not declare an act of the Legislature unconstitutional unless it clearly and plainly violates some express provision. In re Walters Nat. Bank, 100 Okla. 155, 228 P. 953; 6 R. C. L. 104; Cooley's Constitutional Limitations (8th Ed.) p. 351:

"Nor are the courts at liberty to declare an act void, because in their opinion it is opposed to a spirit supposed to pervade the Constitution, but not expressed in words. 'When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the Legislature, we cannot declare a limitation under the notion of having discovered something in the spirit of the Constitution.' * * *"

In Protest of Downing et al., 164 Okla. 181, 23 P.2d 173, we said:

"It is only where an act of the Legislature is clearly, palpably, and plainly inconsistent with the terms and provisions of the Constitution that the courts will interfere and declare such an act invalid and void."

In Excise Board v. Chicago, Rock Island & Pacific Ry. Co., 168 Okla. 523, 34 P.2d 268, it is said:

"Statutes are not overthrown by courts because of the evil or asserted evil of their tendencies, unless they are repugnant to some provision of the Constitution."

Does the act increase the salary or remuneration of these public officials? It was passed and became effective during their term of office. In arriving at the true meaning of section 10, article 23, we must look to and consider its purpose, reason, and object. Similar provisions are found in the federal and other state Constitutions. It is the performance of the official duties of the office that these provisions seek to protect. If the duty or service called for by the act is beyond the scope of or not germane to any of the duties of the office, then necessarily it must fall beyond the pale or field of official action the provision protects, but if it falls within this protected field, it must be stricken down regardless of the wisdom or necessity of the measure. Courts cannot sustain the constitutionality of a statute because of its wisdom, merit, or necessity, and contrariwise, may not strike it down because it may be unwise or unnecessary.

The Kentucky Legislature provided for a judicial council to be composed of certain judges, who, for their services on the council, were to receive extra compensation. The act was passed during the judges' terms of office. In Coleman, Auditor, v. Hurst, 226 Ky. 501, 11 S. W.2d 133, the act was sustained. The situation is so analogous to the case at bar that it appears highly probable our Legislature was familiar with that decision when the act under consideration was passed.

The Kentucky court declared:

"The duties of members of the Judicial Council are not duties added to the office of circuit judge, for which no compensation may be allowed during the term, but the duties are wholly outside of the duties which a circuit judge is required to perform."

The court held valid the extra compensation allowed for the performance of the new duties imposed on the judges.

In the case of Love, Attorney General, v. Baehr, 47 Cal. 364, supra, the court said:

"The Legislature has no more power to compel the Attorney General to perform such service as a part of the duties of his office than it has to compel the Superintend-

ent of Public Instruction to take charge of the State Prison * * *. If, however, he has performed a service which, under the Constitution, is wholly foreign to his office, and which is not and cannot become a part of his official duty as Attorney General, and if the Legislature has seen fit to compensate him for this unofficial service, there is no constitutional impediment to hinder them from so doing."

In State ex rel. Jermit v. Stevens (Nev.) 116 P. 601, the Supreme Court of Nevada, under a similar provision of the Constitution, held that a district judge could accept additional compensation for acting as townsite trustee. This court has announced the controlling and well-settled rule by which every such measure must be tested. In the case of Board of Commissioners, Creek County, v. Bruce, 51 Okla. 541, 152 P. 125, an act providing for the issuance of hunting licenses by county clerks and authorizing them to retain 25 cents of the fee for each license so issued as compensation was tested. It was held that the duty so imposed was merely additional and germane to the duties of the office of the county clerk, and therefore unconstitutional. The controlling rule is stated in the first syllabus as follows:

"A public official is bound to perform the duties of his office for the compensation fixed by law. This is true as to additional duties imposed upon the office by the Legislature after he enters upon his term, provided such duties are germane to the office."

The decision turned on the character of the new duties, that is, whether germane or nongermane. We quote from the opinion:

"As a general rule, a public officer is bound to perform the duties of his office for the compensation fixed by law. This is true as to additional duties imposed upon the officer by the Legislature after he enters upon his term, so long as these duties are germane to the office."

This rule was first announced by this court in the case of Finley v. Territory, 12 Okla. 621, 73 P. 273. It was there held that it was the duty of a probate judge under the law then existing to account for fees received by him while acting in townsite matters and that such duties were not extraneous or foreign to the office, especially in view of the fact that territorial probate judges by act of Congress long prior to this particular judge's assumption of office were required to act in townsite matters. The court took pains to distinguish the case from instances involving nongermane duties of the office. The court, discussing the case of United States v. Brindle, 110 U. S. 688,

4 Sup. Ct. 180, 28 L. Ed. 286, involving such a situation, said:

"Brindle was appointed receiver of public moneys at Lecompton, Kan., and while he was performing the duties of receiver of public moneys he was appointed as a special commissioner to dispose of the Delaware Indian trust lands situated near Ft. Leavenworth, Kan. The Supreme Court of the United States held that he was entitled to a commission on sales of these lands in addition to his compensation as receiver of public moneys. It was expressly held in this case by the Supreme Court that it was no part of the duty of Brindle, as receiver of public moneys of Lecompton, Kan., to sell the trust lands and receive the payments thereof. His duties in connection with that office were to receive and account for public moneys paid for public lands. The moneys paid for the Indian lands were trust moneys and not public moneys. And hence when Brindle was appointed to dispose of the trust lands he was employed to render service in no way connected with the office he held, and no additional duty was imposed upon him as receiver of the land office. In other words, the duties were entirely separate and distinct. They were not one and the same office. Had it been a part of the duties of the receiver of public moneys at Lecompton, Kan., to sell and dispose of Indian trust lands, then certainly it would have been a part of Brindle's duties as receiver of public moneys to perform these additional duties, and no additional compensation could have been allowed. The same doctrine was announced by the Supreme Court of the United States in Converse v. United States, 21 How. 463, 16 L. Ed. 192. In United States v. Saunders, 120 U. S. 126, 7 Sup. Ct. 467, 30 L. Ed. 594, it was decided by the Supreme Court of the United States that the federal law prohibiting the allowance of additional pay or extra compensation to public officers has no application to two distinct offices, places, or employments, each of which has its own duties and compensation, which offices may both be held by one person at the same time. In this case the rule announced in United States v. Brindle was followed."

"In each of these cases the Supreme Court of the United States held that the offices were entirely separate and distinct, and neither dependent upon the other, and therefore the allowance of additional pay, or extra compensation, was permissible. But in the case at bar, as we have shown, the duties that are imposed upon the probate judge attach to that office, and are additional duties and burdens imposed upon such office."

Going to the reported cases and text writers we find complete accord in the statement of the rule. The Minnesota court in

the case of State ex rel. v. Vasaly, 98 Minn. 46, 107 N. W. 818, says:

"It is elementary that, while a public official cannot require extra pay for services rendered by him for which compensation by way of salary is allowed by law, he may recover pay for other services which he may render outside of and in addition to his ordinary official duties which could as well be performed by any other person as by him."

In the annotations appearing in 21 A. L. R. 256, 258, we find the following:

"It is well settled that a statute or ordinance imposing on an officer new duties which are incident to his office, and providing an additional salary or emolument therefor, is in violation of a constitutional provision against increasing the compensation of an officer during his term of office." (And, under "Duties Foreign to Office"): "Where new duties are delegated by statute to a public officer which are without the scope or range of his office, and additional compensation is provided therefor, the statutory increase is not affected by a constitutional provision prohibiting any increase in the compensation of a public officer after his election or appointment."

A still later annotation on the same subject is found in 51 A. L. R. 1522, wherein by way of introduction it is said:

"It will be seen from the earlier annotation that where new duties are delegated by statute to a public officer, which are without the scope or range of his office, and additional compensation is provided therefor, the increase is held to be constitutional, and the later decisions are to the same effect."

The Attorney General in his brief recognizes the rule as announced by the many courts, but contends that in Riley v. Carter, State Auditor, 165 Okla. 262, 25 P.2d 666, a contrary rule was announced. We have carefully examined that opinion. It is an excellent treatise on the importance and necessity of an independent judiciary. It contains nothing criticizing, in any way, the germane-nongermane rule declared by the text writers and by the courts of the several states. The argument of the Attorney General is built upon the erroneous assumption that the act does increase the salary and emoluments of the plaintiffs. It is admitted that the service provided for in the act is foreign, or rather not germane, to the duties of the office of Justice of the Supreme Court. Attorney General's brief, page 67.

It must be evident that such service is foreign to the official duties of a member of this court. Had these very plaintiffs prepared a work such as called for and described in the act in question, and copyrighted it, even the Legislature could not use it without their consent and compensating them for the same, nor could they be properly censored for so doing unless in performing such work they permitted the same to interfere with their official duties.

When a statute imposes duties or calls for the performance of service that is nongermane and beyond the scope of the duties of the office as the same existed prior to the enactment of the statute, the one holding such office may not be required to perform the nongermane duty or service and cannot be disturbed in the enjoyment of his office for his refusal to do so. Any other rule would permit the Legislature to drive an executive or judicial officer from office by passing a statute placing upon such officer nongermane duties or requiring nongermane service, and thereby permit the invasion of the very field section 10, article 23, protects. The cases all hold that where the duties are nongermane and the officer accepts and agrees to perform the nongermane duty or service, the act does not violate such a constitutional provision. See the annotation to the A. L. R. citations, supra.

We have given careful consideration to the Attorney General's argument that these plaintiffs are receiving less salary than their associates, and that the compensation provided for in the act will result in their receiving the same compensation as their associates. This same argument was made in many of the cases announcing the rule. It is not within the province of the judiciary to question the wisdom or motives of a lawmaking body in the enactment of a statute, and the same cannot be taken into consideration in determining its constitutionality. (State v. Johnson, 90 Okla. 21, 215 P. 945; Dickinson v. Perry, 75 Okla. 25, 181 P. 504.) As stated in the Commonwealth v. Moir case, supra:

"With these we have nothing to do. They are beyond our province, and are considerations to be addressed solely to the Legislature. This court is not authorized to sit as a council of revision to set aside or refuse assent to ill-considered, unwise, or dangerous legislation. Our only duty and our only power is to scrutinize the act with reference to its constitutionality, to discover what, if any, provision of the Constitution it violates."

If there was any mistake made in the enactment of this measure, it was on the part of the Legislature, and under decisions of this and other courts we cannot inquire into the wisdom of the legislation.

The defendants charge that the act vio-

lates section 1 of article 4 of the Oklahoma Constitution, which provides for three separate and distinct departments of government and that neither shall exercise "powers properly belonging to either of the others." Neither this section nor the decisions construing the same support this contention. The section operates only to prohibit each department from exercising powers **"properly belonging"** to one of the other departments of government. In short, it is to prevent one department from **interfering** with the proper functions of other departments. Unless the duty or the power involved does properly belong to some other branch of the government, this section does not forbid its exercise by the branch of government under consideration. The act in question does not grant "powers", it provides for duties. See Ross v. Board (N. J.) 55 Atl. 310; People v. Provines, 34 Cal. 520; and State v. Circuit Court (N. J.) 15 Atl. 272.

In State Bar v. McGhee, 148 Okla. 219, 298 P. 580, this distinction was clearly set forth. It was there held that even though a duty or power does not properly belong in one of the three departments of government, it may constitutionally be exercised by that department unless it "properly belongs" to one of the other two departments. The following Oklahoma decisions recognized the same rule: Rumsey v. Diamond, 127 Okla. 72, 259 P. 849; Levine v. Allen, 96 Okla. 252, 221 P. 771; City of Guthrie v. New Vienna Bank, 4 Okla. 194, 38 P. 4; Oklahoma Aid Ass'n v. Thomas, 125 Okla. 190, 256 P. 719; Riley v. State ex rel. McDaniel, 43 Okla. 65, 141 P. 264; Remer v. State, 3 Okla. Cr. 706, 109 P. 247.

The compiling and annotating of statutes is not an **exclusive** function or power in either the executive, legislative, or judicial branch of the government, and certainly the performance of the same can in no manner interfere with either the executive or legislative branch of the government.

Defendants assert that if House Bill 239 is considered as conferring duties upon individuals and not Justices of the Supreme Court, then it violates sections 32, 51, and 59 of article 5 of the Oklahoma Constitution, which relate to special or local laws, forbid the passing of any law granting to any individual any exclusive rights, privileges, or immunities, and that laws of a general nature shall have a uniform operation throughout the state. It should be noted that the proposition is stated in the conditional or tentative manner; and that if the act is not considered as conferring duties upon individuals, the proposition is con-

cededly not applicable. The act does not purport to assign powers to any individual. It provides for the performance of duties by a class, namely, those Justices who were elected at the November, 1934, election, a class who had at least two years of experience on the Supreme Court and had four years yet to serve. The daily work of the members of this court requires them to deal with and study the very procedural statutes the act seeks to have revised. Their service on this court of necessity gives them a great opportunity to be better qualified than other classes of lawyers or judges. The plaintiffs do the work separate and apart from their judicial duties. The duty is not assigned to them as individuals, but as a class. Furthermore, there are no "exclusive" rights, privileges, or immunities involved in the doing of the work. Many instances may be found in our statutes where the Legislature has imposed upon certain groups of officers, by naming the offices instead of individuals, duties to be performed in the interest of the state. It is clear that such a method is not the granting of a power to any individual, within the meaning of the Constitution.

The constitutional prohibition against special legislation, unless notice of the intended introduction of such bill be advertised as required by section 32, article 5, can be applied only when proof is made that no such publication occurred. Dunlap v. Board of Co. Com'rs Carter Co., 85 Okla. 295, 205 P. 1100; Protest of Chicago, R. I. & P. Railway Co., 137 Okla. 186, 279 P. 319. The Legislature has a very wide discretion in making classifications when the legislation pertains to a peculiar subject matter such as is covered by this act. The duties and services therein called for must be performed by a class, or persons, having high professional training and experience. The members of this court are constantly called upon and required to study and consider our civil, probate, and appellate procedure statutes. Consequently, those members who have had two years of experience on this court should have thereby attained a better knowledge or qualification than others with less experience, and if the work will require four years to complete, those who have at least four more years to serve will be aided or further qualified in the performance of the service by the work they are required to do as members of this court. When the act in question was passed, three members of this court fell into class just entering upon a six-year term, three into a class having but two years of their terms to serve, and the class, to which the plaintiffs belong, having four years more

to serve. The act in so classifying those authorized to perform the service cannot be said to be arbitrary.

The next objection to the act proposed by the defendants is that it violates section 55 of article 5 of the Constitution, which forbids the paying out of money, from the treasury of the state, except in pursuance of an appropriation by law, and which provision contains certain other details not material to this case. The defendants call our attention to the failure of the Legislature to make an appropriation for paying for the services of plaintiffs. The act provides a compensation for the services to be rendered and provides that the compensation shall be payable monthly. The argument of the Attorney General here seems to be that the decisions of the Supreme Court in the case of State ex rel. Telle v. Carter, 170 Okla. 50, 39 P.2d 134; Battles v. Childers, 177 Okla. 589, 61 P.2d 253, and Edwards v. Carter, State Auditor, 167 Okla. 287, 29 P.2d 610, are incorrect and are too great an extension of the rule announced in the case of Riley v. Carter, 165 Okla. 262, 25 P.2d 666. We decline to disturb the rule of law this court has announced in these well-considered cases. Decisions construing constitutional provisions should not be overruled, save for very weighty reasons. At the time the act in question was passed, this court had so construed the constitutional provision relied upon. The act shows a clear intent on the part of the Legislature to provide payment for the services imposed, and it might well have had in mind the decisions of this court the Attorney General now complains of.

The final argument of defendants is that the act was passed by the Legislature in violation of section 34 of article 5 of the Oklahoma Constitution, requiring that every bill shall be read on three different days in each House, and stating further requirements not urged in the instant case. The rule in this state is that an enrolled bill which has gone through the formalities prescribed by Coyle v. Smith, 28 Okla. 121, 113 P. 944, affirmed by the Supreme Court of the United States in 221 U. S. 559, 55 L. Ed. 853, 31 S. Ct. 688, cannot be impeached. The following rule is stated therein:

"When an enrolled bill has been signed by the Speaker of the House and by the President of the Senate respectively, in the presence of those bodies immediately after the bill has been read publicly at length, and the same has been approved by the Governor and deposited in the office of the Secretary of State, it is not competent to show from the journals of the House that the act

so authenticated, approved, and deposited was not read on three different days in each House."

The question of whether or not these plaintiffs have performed the service as called for in the act, and as specifically set forth in their verified claim and verified petition, cannot be raised by respondents as a ground for denying their claims. The act does not require piecemeal work or a showing each month of the amount of the work performed as a condition precedent to receiving the monthly payment.

We are of the opinion that House Bill No. 239 is a constitutionally valid legislative enactment. The writ of mandamus is accordingly made permanent.

LINEBAUGH, C. J., and STEVENS, YANCEY, and WILHITE, JJ., concur. LUCAS, LACKEY, and WOODALL, JJ., dissent. WHEATLEY, J., absent.

The following members of the Bar served as Special Justices: Richard L. Wheatley, Vinita; W. A. Lackey, McAlester; O. A. Cargill, Oklahoma City; A. J. Stevens, Alva; Person E. Woodall, Norman; Chas. L. Yancey, Tulsa; D. H. Linebaugh, Muskogee; C. O. Lucas, Holdenville; Sam L. Wilhite, Anadarko.

LUCAS, Special Justice (dissenting). This is an action in mandamus filed by the plaintiffs against the defendants, the State Auditor and State Treasurer, to require said defendants to receive, file, approve, and pay their claims for services performed by them under authority of House Bill No. 239, which bill, including the title, is in words and figures as follows:

"An Act making it the duty of **certain** Justices of the Supreme Court to prepare an annotated compilation of all laws of this state relating to civil and probate procedure, together with proper explanatory notes thereon, same to be filed in the State Library as a public record, subject to inspection and publication; providing for the continuation of such annotated compilation and explanatory notes; requiring acceptance of provisions of act; fixing the compensation of said Justices for said services.

"Section 1. Supreme Court—Procedural Statutes—Annotation.

"Inasmuch as the laws of Oklahoma on civil and probate procedure, including procedure relating to appeals to the Supreme Court, are, by reason of the many apparently conflicting and ambiguous provisions relating thereto which have been enacted since the adoption of the Revised Laws of Oklahoma of 1910, in such a state of confusion and uncertainty that in many cases

the rights of litigants and of parties affected are prejudiced, impaired, or destroyed, which condition can be most properly remedied by the preparation and publication of an annotated compilation of said laws and proper explanatory notes thereon, it shall be the duty of the Justices of the Supreme Court of Oklahoma who were elected at the regular general election held on November 6, 1934, to prepare, in such manner as they deem proper, an annotated compilation of all such laws, including all laws enacted by the Fourteenth, Fifteenth and Sixteenth Legislatures of Oklahoma; said compilation and annotations to be supplemented by proper explanatory notes, which compilation shall be filed in the State Library as a public record, and as such shall be subject to inspection by the public and to publication by any responsible law book or other publishing company. Said annotated compilation and explanatory notes shall be, from time to time, supplemented by said Justices so as to include any changes occasioned either by legislative enactment or judicial interpretation; provided that said compilation shall be completed and said supplemental services terminated by the second Monday of January, 1941; provided further that before said Justices shall be authorized or required to perform the services defined by this act, same to be performed so as not to interfere with their regular official duties, they shall each file a certificate in the office of the Secretary of State setting forth their willingness to perform said services.

"Section 2. Salary.

"Each of said Justices of the Supreme Court shall receive as compensation for the services required by this act an annual salary of $2,500.00, payable monthly.

"Approved May 22, 1937."

The constitutionality of this act has been raised by the Attorney General, on behalf of the defendants. If this act is constitutional, the writ of mandamus should issue, and the claims of the plaintiffs paid. If the act is in violation of the Constitution, the writ should be denied. Therefore, the question before the court is to determine the constitutionality of this act. To determine this, it will be well to first consider the logical steps leading to the passing of said Bill No. 239 by the Legislature.

First: "Until changed by the Legislature," the Constitution, under section 16, Schedule, fixes the salary for each of the Supreme Court Justices at $4,000 per annum. The Legislature by House Bill No. 290 (1919 Session) fixed the salary for the first time after the adoption of Constitution and construed section 10, article 23, in connection with section 16 of the schedule. The Legislature "having once exercised the right,

thereafter the right to change such a salary a second time falls within the general provision of the Constitution as set out in section 10 of article 23." The Legislature in House Bill No. 517, approved May 1, 1933, provided for a salary of $5,000 per year for each Justice of the Supreme Court. The three Justices and plaintiffs in this case were elected as Justices of the Supreme Court after this act was approved and in effect and are therefore entitled to the salary provided therein. Their election being at the regular general election of November 6, 1934, hence they began their services and are serving as Justices under the salary fixed by this act at $5,000 per year each. Their term expires in January, 1941.

Thereafter the Legislature by House Bill No. 21, approved January 4, 1937, fixed the salary of each Justice of the Supreme Court at $7,500 per year. Under this act, for all Justices elected since its approval, there can be no dispute as to their right to the salary of $7,500 provided therein. In this connection it will be observed that six Justices are now receiving salary of $7,500 and three Justices are receiving a salary of $5,000.

The Attorney General contends that this House Bill No. 239, quoted in full at beginning of this opinion, is an act intended to equalize the salaries of the Justices, and is in violation of section 10 of article 23, which provides:

"Except wherein otherwise provided in this Constitution, in no case shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment; nor shall the term of any public official be extended beyond the period for which he was elected or appointed: Provided, That all officers within this state shall continue to perform the duties of their offices until their successors shall be duly qualified.".

—and also is in violation of section 32, article 5, which provides:

"No special or local law shall be considered by the Legislature until notice of the intended introduction of such bill or bills shall first have been published for four consecutive weeks in some weekly newspaper published or of general circulation in the city or county affected by such law, stating in substance the contents thereof, and verified proof of such publication filed with the Secretary of State." .

—and in violation of section 51 of article 5, which provides:

"The Legislature shall pass no law grant-

ing to any association, corporation, or individual any exclusive rights, privileges, or immunities within this state."

—and in violation of section 59 of article 5, which provides:

"**Laws of a general nature shall have a uniform operation throughout the state,** and where a general law can be made applicable, no special law shall be enacted."

—and in violation of section 55 of article 5, which provides:

"No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

—and in violation of section 1 of article 4, which provides:

"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

—and in violation of section 34 of article 5, which provides:

"Every bill shall be read on three different days in each House, and no bill shall become a law unless, on its final passage, it be read at length, and no law shall be passed unless upon a vote of a majority of all the members elected to each House in favor of such law; and the question, upon final passage, shall be taken upon its last reading, and the yeas and nays shall be entered upon the journal."

—and in violation of section 3568 of 1931 Statutes, which provides:

"It shall be unlawful for the State Auditor to issue or draw any warrant in disbursement of the Public Building Fund, Section 13 Funds, New College Funds, Game Protection Fund, General Revenue Fund or any other state fund or funds under the management of the state, except in pursuance of an appropriation act in which the amount appropriated shall be distinctly specified and stated. Provided, no warrant shall be issued by the State Auditor in disbursement of any moneys appropriated out of any of the funds above mentioned after two and one-half years from the date of the passage of any such appropriation act. And

provided further, that in event of the issue by the Auditor of any warrant without an appropriation having been first provided for such purpose by the Legislature, or in excess of the amount appropriated, the same shall not be a charge against the state or paid from its funds, but shall be a charge against the Auditor and his bondsmen."

To determine the constitutionality of House Bill No. 239, the court must examine into its effect and the results it was intended to accomplish and ascertain the intent and purpose of the Legislature in passing said act. If this act is in violation of any of the above constitutional provisions, then said act should be held unconstitutional. The court in passing on the validity of this act must endeavor to obtain the true intent, purpose, and effect of the act and has a right to look to the face of said act to help determine this.

The constitutionality of an act depends on its real character and on the end designed to be accomplished rather than on its title or the professions as to its purpose which may be contained in it, and such declarations do not conclude the court. The court should endeavor to determine the true purpose and effect of said act. The court is not limited to the letter of the law, or mere form, nor should be misled by mere pretense, or subterfuge. The court should look to, or determine what may be done under and by virtue of said act, that is, its effect.

Turning to the act, we observe these elements which in our judgment show conclusively said act was intended by the Legislature to be an act raising the salary of these three Justices, plaintiffs herein, from $5,000 per year to $7,500 per year, thus equalizing the salary with the remaining members of the court.

Let us now examine said House Bill No. 239 and see if it shows on its face this intent and effect.

First: The salary of $2,500 fixed in this bill is the exact difference between the salary of the present six members of the court and the three plaintiffs herein. It takes this amount to equalize the salaries. This compensation means $208.33 1/3 per month. It appears to me this is rather an odd amount. Few, if any, monthly payments provided in acts of Legislature fix odd monthly payments. $208.33 1/3 was the exact amount necessary to equalize the salaries.

Second: This salary provided in said act is **payable** monthly although the bill provides for service for a **lump job or duty** to be performed.

This is very significant. In the business world do you know of anyone employed to do what we call a **"turn-key"** or finished job who is paid monthly, without any consideration as to the amount of work done or performed on said job? This act authorized a salary payable monthly. The act also provides that when the compilation and annotation is completed it shall be filed in the State Library, and shall be done by January, 1941. This is a definite "turn-key" job. If the plaintiffs can complete this work in 30 days or six months, they are not required, under this act, to file same in the State Library until the second Monday in January, 1941.

Third: The act provides that "it shall be the duty of the Justices of the Supreme Court of Oklahoma, **who were elected at the regular general election held on November 6, 1934, to prepare,**" etc. The record, of which this court must take judicial notice, reveals that the plaintiffs in this case are the ones intended for said duty. The act specifically providing that the members of the court regularly elected in the general election held on November 6, 1934. No other members of the Supreme Court can qualify under this bill **and receive the salary provided therein.** No other individuals in the state can qualify under this bill **and receive the salary provided therein.** This specifically and definitely fixes but three members of the Supreme Court and these three members are the members drawing a salary of $5,000 per year each.

The Supreme Court is composed of nine members and may properly be considered as a class. What substantial difference distinguishes these three Justices from the other six Justices?

In my humble opinion, the fact that these three Justices were elected November 6, 1934, does not place them in a **"class"** such that discrimination may not be considered. Creating a "class" by legislative act must not be arbitrary or capricious, and must not be used as a subterfuge for the purpose of passing a special law under the form of a general law.

Fourth: The act further provides that their services shall terminate the second Monday in January, 1941. It is significant that this date is the exact date upon which the plaintiffs' services as Justices terminate. In other words, their salary, if re-elected, would be fixed by law thereafter at $7,500 per year.

Fifth: The beginning of their duties under this act was the very day that this purported act became effective.

Sixth: On the face of the title of this bill we find these words: "An Act making it the duty of **certain** Justices of the Supreme Court to prepare," etc. There on the face of the title of said act we have the word **certain,** meaning without question a part or a select few of the members of the Supreme Court. **Certain** Justices of the Supreme Court shall do the duty provided in this bill. This does not mean all the Justices. The **certain** members of the Supreme Court were those elected at the regular general election held on November 6, 1934. These Justices alone are the Justices of the Supreme Court who are entitled to draw the $2,500 per year each, if this act is valid. This act of the Legislature has selected certain Judges and definitely determined who they are.

It is certain that the **certain** Justices are the three plaintiffs. The other six members are not to be considered in this duty to be performed. This is an arbitrary discrimination, too plain for repudiation, notwithstanding the holding of the majority opinion herein. This **"three member class"** is a class discrimination, and is a subterfuge without precedence.

Seventh: This court must take judicial knowledge of House Bill No. 444, being an act authorizing the Board of Governors of the State Bar of Oklahoma to proceed with the proper and necessary steps leading to a **complete** revision of the laws of the State of Oklahoma; to make annotations, surveys and drafts of needed changes in the statutory laws of the State of Oklahoma; and to make contracts for carrying out the purposes therein set forth and made an appropriation of $35,700.11 to carry out this purpose. This act was approved (with emergency section) May 22, 1937, which was the same day House Bill No. 239 was approved. The duty conferred on the Board of Governors covers **all** the duties conferred in House Bill No. 239. The intent and purpose of the Legislature in the passing of these two bills cannot be construed from any reasonable interpretation except that Bill No. 444 was intended for the Board of Governors to do a certain duty in reference to the revision of the Statutes, and the other Bill, No. 239, was intended as an increase in salary to equalize the compensation of all members of the Supreme Court. No evidence has been submitted showing plaintiffs have performed any work under said act. There is no penalty provision

compelling the work to be done, just so it is finished by 1941. The state makes no such contracts advancing full, or near so, consideration, or compensation without service rendered or material furnished.

Eighth: The court must take judicial knowledge of Senate Bill No. 249, which provides for the appointment of a legal assistant to each of the Justices of the Supreme Court, at a salary of $4,000 each per year, payable monthly, and in section 2 of said act, for the appointment of additional legal assistance for each Justice of the Supreme Court for a period of two years at a salary of $3,600 each per year, payable monthly. This act was approved May 5, 1937, 17 days prior to the approval of House Bill No. 239.

Certainly no other conclusion can be drawn than that the duty of these Justices was more than they could perform and this additional help was given them. If this is true, then it is difficult for me to understand why the Legislature should confer upon these three members additional duties (House Bill No. 239) to perform, for which they are to pay a salary to each of $2,500. If the duties of all members of the Supreme Court were overtaxed, why and under what theory of justice and common sense would the Legislature confer additional duties on three members of said court? If you are doing all the work you can do, how can you do more? The members of the Legislature were cognizant of Act 249 when they passed House Bill No. 239. They were also cognizant of Act 444, which was approved the same day and set out the same and overlapping duties to be performed. Without question, I believe House Bill No. 239, under these circumstances, was truly intended to equalize the salary of the Justices.

Ninth: There is no provision in the bill providing for continuation of the work if one member should resign. The duty conferred under this act, if valid and reasonable, requires the services of three Justices to perform this act. I am wondering what position would exist if two members should resign, leaving the entire undertaking to be performed by one remaining Justice. Surely, this would be inequitable for one man to perform the duty that the Legislature had authorized three men to perform.

These nine members are full time employees or officers of the state. Any non-germane duty performed by three members would by necessity take some time or thought from their official duty, and add extra duty to the remaining six members.

This would be inequitable and unfair and cause discontent.

The court must not only look to the intent and purpose of an act, but to the effect of said act.

After reading and analyzing House Bill No. 239, the intent, purpose, and effect of said act is obvious. The act must and can only be considered as an act to equalize the salary of the plaintiffs in this case with the other Justices of the court. **After reaching this conclusion,** then without question, the act is in violation of section 10, article 23, which provides:

"Except wherein otherwise provided in this Constitution, in no case shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment; nor shall the term of any public official be extended beyond the period for which he was elected or appointed: Provided, That all officers within this state shall continue to perform the duties of their offices until their successors shall be duly qualified."

By the great weight of authority the court is empowered to look to the face of the bill to determine the intent, purpose, and effect of an act.

From 6 Ruling Case Law, section 79, page 81, we have these general principles laid down:

"In passing on the constitutionality of a statute, it is frequently important to examine into its effect **and the results it was intended to accomplish,** as, for instance, whether a state statute invades the domain of federal authority. In ascertaining the intention the courts may also look at the consequences of a particular interpretation. The constitutionality of an act depends rather on its real character and on the end designed to be accomplished, than on its title or to the professions as to its purpose which may be contained in it, and therefore such declarations do not conclude the courts. The general rule therefore is, in whatever language a statute may be framed, its purpose and its constitutional validity must be determined by its natural and reasonable effect."

6 R. C. L., sec. 80, p. 81, also lays down this general rule in determination of the intent and effect of an act of the Legislature:

"It has been said that the eyes of the courts are never limited to the mere letter of a law, but that they may look behind the letter to determine its true purpose and effect. Accordingly the principle has been laid down that the courts are not bound by mere forms, nor are they to be misled by

mere pretenses, but they must look at the substance of things, whenever they enter on the inquiry whether the Legislature has transcended the limits of its authority. It is not necessary to impute bad motives to the Legislature in order to render a statute unconstitutional, it being not the motive causing the enactment, but its effect, which will determine the question of constitutionality. The question as to the constitutionality of an act is to be determined, not by what has been done under it in any particular instance, but by what may be done under and by virtue of its authority. In some cases, however, the courts may properly have recourse to an assumed state of facts in order to test the validity of a statute."

So in Soon Hing v. Crowley, 113 U. S. 703, 710, 5 Sup. Ct. 730:

"* * * The rule is general with reference to the enactments of all legislative bodies that the courts cannot inquire into the motives of the legislators in passing them, **except as they may be disclosed on the face of the acts, or inferrable from their operation,** considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments."

In the case of State v. Smiley, 69 P. 199 (Kansas) was laid down the general rule of construction of statutes which appears to me to be good law. That court says:

"We construe the general words of our statute to be comprehensive only of those cases which are the rightful subjects of legislation of the kind in question. However, we disavow doing so merely in order to shelter the statute under the rule mentioned, but because the ancient established and wise canon of interpretation requires it to be done. Sporadic and anomalous cases indicating to the contrary may be found, as they may be found to the contrary of every settled accepted doctrine of the law; but the rule that the general words of statutes will be restricted in application to cases presumptively within the **legislative intent** has been so long accepted as a cardinal principle that its occasional denial, even by the most learned of courts, fails utterly of adverse impression. It happens in two sorts of cases that it is necessary to interpret the laws. **One** is when we find in a law some obscurity, ambiguity or other defect of expression; for in this case it is necessary to interpret the law in order to discover its true meaning. And this kind of interpretation is limited to the expression, that it may be known what the law says. The **other** is when it happens that the sense of a law, how clear, however, it may appear in the words, would lead us to false consequences, and to decisions that

would be unjust, if the laws were indifferently applied to everything that is contained within the expression; for in this case the palpable injustice which would follow from this apparent sense obliges us to discover by some kind of interpretation, **not what the law says, but what it means,** and to judge by its meaning how far it ought to be extended, and what are the bounds that ought to be set to its sense."

The point in this case is "not what the law says, but what it means," not what the wording of Act No. 239 says, but what its real meaning and effect is, that is the question.

In the case of State ex rel. Owen v. Carter, State Auditor, 77 Okla. 28, 186 P. 454, we have a very carefully considered opinion construing section 10, article 23, of the Oklahoma Constitution, and very forcefully states the purpose of said constitutional provision. The court says:

"It is a familiar principle of law that language used in a Constitution must be construed in its common accepted sense, and that every effort should be exercised to hold the acts of the Legislature constitutional unless they are clearly in violation of a prohibition of the Constitution. The court feels that effect must be given to the manifest intention of the framers of the Constitution when they provided in section 16 of the Schedule for temporary salaries of Justices of the Supreme Court and district judges, to continue until changed by the Legislature, and that there is no limitation upon the right of the Legislature to so change said salaries at any time, whether during the term of office of an incumbent or prior to the beginning of said term, and that the only limitation upon the right of the Legislature to so change said salaries is that, **having once exercised the right, thereafter the right to change such a salary a second time falls within the general provisions of the Constitution as set out in section 10 of article 23.**"

In paragraph 4 of the syllabus it is said:

"The authority to change the salaries, during the term of office, provided for in section 10 of article 23 and section 16 of the Schedule to the Constitution, same having been exercised, the power thereunder is exhausted. Chapter 145, Session Laws 1917, is not a change of salaries of Justices of the Supreme Court."

The Attorney General has very forcibly said:

"If the salary and emoluments of three Justices may be increased by legislation such as that contained in House Bill No. 239, the salary and emoluments of all nine of the Justices could be increased by similar legislation. The purpose and intent of section 10, article 23, Oklahoma Constitution, as it relates to the judiciary, being to remove any

possible influence the legislative branch of government might have over the judicial branch by reason of a power to increase or decrease the compensation of members of the judiciary, the intent and purpose of said section of the Constitution is violated if the Legislature is permitted to increase the compensation of members of the Supreme Court by conferring authority upon members of the court to perform additional duties not germane to the duties of their offices for such additional compensation. The defendants contend that the purpose and intent of section 10, article 23, of the State Constitution cannot be circumvented in any such manner. To permit it, is to nullify said section of the Constitution and render the restriction therein expressed a farce."

In support of the above, attention is called to the case of Trapp, State Auditor, v. Cook Construction Company, 24 Okla. 850, 105 P. 667, wherein the court held:

"A thing within the intent of a constitutional enactment is, for all purposes, to be regarded within the words and terms of the Constitution; and a legislative enactment, evading the terms and clearly expressed or necessarily implied purposes of the Constitution, is as clearly void as if in express terms forbidden."

In determining the intent and purpose of House Bill No. 239, this court may and should look at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the lawmakers. In the case of De Hasque v. Atchison, T. & S. F. Ry. Co., 68 Okla. 183, 173 P. 73, the court held:

"Among other things which may be considered in determining the intent of the lawmakers is the evil which it is designed to remedy; and therefore this court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the lawmakers."

The Legislature was confronted with an unequal situation upon the Supreme Court. Six Justices received salaries of $7,500 per year each, and three Justices received salaries of only $5,000 per year each. To remedy this situation the Legislature sought to evade the prohibition in section 10, article 23, of the State Constitution against increasing the salary or emoluments of said three Justices during their present terms of office by providing extra nonjudicial duties and additional compensation at the rate of $2,500 per year for each of said three Justices who were receiving only $5,000 per year. It is significant that these three particular Justices were selected to do the work. It is significant that House Bill No. 239 specifically provided that the services and the additional compensation therein provided for said three Justices shall terminate by the second Monday of January, 1941, when their terms of office as Justices of the Supreme Court expire. Bearing all of the facts surrounding the passage of this bill in mind, it is plain that the Legislature attempted to circumvent the above constitutional prohibition when it enacted House Bill No. 239. It is plainly evident that the prime purpose of House Bill No. 239 was to increase the compensation of said three Justices so that their salaries and emoluments would equal that of the other six Justices. This being the primary purpose of the act, it violates both the letter and the spirit of section 10, article 23, of the Oklahoma Constitution. Said section states:

"In no case shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment."

The above is stronger language than is found in most Constitutions. It states that in no case shall the salary or emoluments of any public official be changed after his election or during his term of office except by operation of a law enacted prior to his election.

House Bill No. 239 was enacted during the present existing terms of office of the plaintiffs as Justices of the Supreme Court. The word "emolument" is more comprehensive than the word "salary," and includes gain, profit, compensation, et cetera. Words and Phrases, vol. 3 (First Series, p. 2367); vol. 2 (Second Series) p. 259; Webster's New International Dictionary. House Bill No. 239 specifically designates these public officials, plaintiffs in this case, to receive compensation that such public officials did not theretofore receive. House Bill No. 239 provides that "the Justices of the Supreme Court of Oklahoma who were elected at the regular general election held on November 6, 1934," shall receive this additional compensation. If House Bill No. 239 is sustained as valid, then this is a case where the emoluments of a public official have been increased by a law enacted after his election and during his term of office, although section 10, article 23, Oklahoma Constitution, states that in no case shall the emoluments of a public official be changed after his election or during his term of office unless by operation of a law enacted prior to such election.

In the case of Thomas et al. v. Reid, 142 Okla. 38, 285 P. 92, the court held:

"All legislative enactments must be in harmony with the spirit of the Constitution, and no legislative act may curtail the rights reserved by the Constitution to the people."

In the opinion in this last case the court quoted the following with approval from the case of State ex rel. Smyth v. Moore, 55 Neb. 480, 76 N. W. 175:

"An act violating the true intent and meaning of the instrument although not within the letter is as much within the purview and effect of a prohibition as if within the strict letter; and an act in evasion of the terms of the Constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purposes, is as clearly void as if in expressed terms forbidden. A thing within the intent of a Constitution or statutory enactment is, for all purposes, to be regarded as within the words and terms of the law."

From these authorities it is obvious that the court owes the duty to carefully read, analyze, and determine the purpose, intent, and effect of the legislative act, and having reached the conclusion that said act No. 239 is in violation of article 10, section 23, of the Constitution, it would seem useless to further discuss this case. Proceeding further, however, I am of the opinion that House Bill No. 239 is a special act and in violation of section 59 of article 5.

Our Supreme Court in the case of Wilkinson v. Hale, 184 Okla. 165, 86 P.2d 305, handed down January 10, 1939, by Justice Davison, discussed very logically the constitutionality of an act of the Legislature which I think is analogous and applicable to the case at bar. The law and facts set forth in the opinion are so precise and definite that I shall copy herewith the entire opinion as follows:

"DAVISON, J. This is an action in mandamus presented to this court on appeal from a decision of the district court of Tulsa county denying the writ.

"This plaintiff (plaintiff in error in this court) is by profession a school teacher. Prior to the time the case was tried in September, 1937, she had taught 15 years, 12 of which had been in school district No. 19 of Tulsa county, which included within its territorial limits the city of Sand Springs.

"In March of 1937, while she was teaching the school year of 1936-1937, but prior to the completion thereof, she was formally notified of action by the board of education of district No. 19, whereby she had been selected as one of the teachers of the district for the ensuing school year of 1937-1938. However, no action of a similar character was taken by the board subsequent to the commencement of the fiscal year on July 1, 1937, but, on the contrary, she was notified in August, 1937, that her services would not be required.

"Plaintiff thereupon commenced this action in mandamus to compel the board of education of school district No. 19 to classify and reinstate her as a teacher in said district.

"As we understand the briefs in this case, it is conceded that the board of education had no authority to enter into a valid contract employing a teacher for the school year of 1937-1938, prior to the commencement of the fiscal year on July 1, 1937, and that the plaintiff's hope of prevailing in this action rests solely upon the provisions of article 16, chapter 34, S. L. 1936-37 (Senate Bill No. 139), known as the Teachers Tenure Law, which was passed with an emergency clause incorporated and approved on May 3, 1937.

"The act is calculated to afford a measure of security to teachers employed by school districts situated in the sections of the state to which it is applicable. It provides for the classification of teachers in accordance with their past experience, employment, and contemplates that they cannot be discharged or replaced without cause.

"The defendants urge, among other contentions, that article 16, chapter 34, S. L. 1936-37, supra, is in violation of section 46, article 5, of the Oklahoma Constitution, prohibiting local or special laws 'regulating the management of public schools,' and section 59, article 5, of the Oklahoma Constitution, providing that laws of a general nature shall have uniform operation throughout the state, and that where a general law can be made applicable no special law shall be enacted.

"The position taken by the defendants is based upon the limited application of the law as indicated by chapter 34, art. 16, sec. 1, 'S. L. 1937, as follows:

" 'In all counties in the state having a city therein of over one hundred thousand (100,000) population according to the last preceding regular decennial federal census, there is hereby established a legal procedure for, the proper selection in the employment of teachers in the public schools of the several districts within said counties and the conditions under which they may be discharged or demoted.'

"By reason of the foregoing provisions the law is placed in operation only in those school districts situated in Oklahoma and Tulsa counties, to the exclusion of districts situated in all other portions of the state.

"It is not essential, in order that a law be general in its operation as distinguished from local or special, that it be universal in its application and operate the same in every section of the state and upon all persons, individuals or corporations alike. On the contrary, the Legislature may classify for

legislative purposes, but a classification so adopted must be neither arbitrary nor capricious and must bear a reasonable relation to the object to be accomplished. Key v. Donnell, 107 Okla. 157, 231 P. 546. When a classification is attempted, its reasonableness is tested by the rule announced by this court in School District No. 85, Kay County, v. School District No. 71, Kay County, 135 Okla. 270, 276 P. 186, where we said in paragraph 4 of the syllabus:

"'Local or special laws are all those that rest on a false or deficient classification. Their vice is that they do not embrace all the class that they naturally embrace. They create preference and establish inequality. They apply to persons, things, and places possessed of certain qualities or situations and exclude from their effect other persons, things, or places which are not dissimilar in this respect.'

"We are here confronted with an act applicable to school districts situated in only two counties of this state and those two counties are selected to the exclusion of others upon the basis of the existence therein of cities containing more than 100,000 population. The capricious nature of the classification adopted and its effect in making the law 'apply to persons, things, and places possessed of certain qualities and exclude other persons, things or places not dissimilar', is singularly illustrated in the case at bar. Application of the law is here sought in connection with the management of the school system in the city of Sand Springs, a city of approximately 8,000 population. What peculiarity of that school district distinguishes it from the many other school districts of the state outside Tulsa and Oklahoma counties containing cities of similar size?

"What substantial difference distinguishes the school system of Sand Springs from the school systems of the many other towns of Oklahoma of comparable area and population? No real distinction is pointed out by the plaintiff, nor can any be perceived by us. There is no connection between the population of the principal city in a county and the employment of teachers in the school districts of the county, especially in those districts lying outside the corporate limits of the principal city. The absence of distinctive features renders the law objectionable on constitutional considerations. In Burks v. Walker, 25 Okla. 353, 109 P. 544, we said:

"'There must be some distinctive characteristic upon which a different treatment may be reasonably founded, and that furnishes a practical and real basis for discrimination.'

"In Key v. Donnell, supra, it was stated that:

"'When the Legislature attempts to legislate upon any subject and makes classifi-

cation by reference to population, that classification must be legitimate and bear some reasonable relation to the subject matter and must not be an arbitrary or capricious classification and used as a subterfuge for the purpose of passing a special law under the form of a general law.'

"And in Roberts v. Ledgerwood, 134 Okla. 152, 272 P. 448, our language was particularly appropriate to the case now before us. We said:

"'As to the two counties affected, there is no distinctive characteristic upon which a different treatment as to them may be reasonably founded, neither is there a characteristic shown which furnishes a practical and real basis for discrimination against the other counties of the state. The classification, therefore, becomes arbitrary and without relation to the subject matter, and fails to show that the two counties with reference to the subject matter are in a different position than the other counties in the state. Since this is true, the act becomes local and cannot be upheld as a general law.'

"See, also, Thompson v. Stanley, 183 Okla. 445, 83 P. 2d 386.

"Upon consideration of the foregoing authorities, we are of the opinion, and hold, that article 16, chapter 34, S. L. 1936-37, is unconstitutional.

"On the question of whether the legislative aim intended by this act could be accomplished by a general act, as well as other questions presented in the briefs, we express no opinion.

"The decision of the trial court is affirmed.

"OSBORN, C. J., BAYLESS, V. C. J., and WELCH, CORN, GIBSON, HURST, and DANNER, JJ., concur. RILEY, J., absent."

The principles laid down in the above case appear to me to be in point with the case at bar. Each act grants a privilege to a special class. In the above case teachers in certain counties were given certain legal rights which the other teachers in other counties did not enjoy. In the case at bar three members of the Supreme Court are given certain rights which the other members of the same class were not permitted to enjoy. This decision is logical, correct without question and in no way attempts to circumvent the constitutional provision. In the face of this decision and the authority cited therein, House Bill No. 239 is and should be held unconstitutional.

There is no provision in House Bill No. 239 for an appropriation to provide payment for the service imposed. By no stretch of the imagination may one construe an intent on the part of the Legislature to provide said payment. This act therefore is in di-

rect conflict with section 55 of article 5 of our Constitution, which provides:

"No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

In Riley v. Carter, 165 Okla. 262, at page 272, 25 P.2d 666, at page 676 of 25 P.2d, the learned Justice said:

"It cannot be denied that, had the Legislature attempted to increase the salary of relator during his term of office, section 10, article 23, would have effectually prevented the payment of such an increase at the suit of any taxpayer without the necessity of supplemental legislation. If the provision is self-executing as to an unconstitutional increase of compensation, can a similar status be denied it as to the proposed unconstitutional decrease?"

Having heretofore concluded that Act 239 was intended to equalize the salary of all nine Justices, this paragraph just quoted should settle the question involved herein. It is not my policy to approve an act which by common sense convinces me was intended as a subterfuge. The provisions of the Constitution of Oklahoma shall not be circumvented. The facts in this case are well known. The Legislature's intent and purpose is well known. I shall not join in any subterfuge to equalize the compensation.

In the case at bar, there was no office created. The Legislature just simply attempted to confer a duty on three members of the Supreme Court. This act does not appoint an officer, does not create an office. It merely attempts to confer an additional duty.

I am unable to agree in the conclusions of the reasoning of the majority of the court in this case, so dissent therefrom.

It has always been said that most laws were founded on reason and common sense. I remember in my college days I had a very wise professor who said to us: "That good laws are founded on common sense and reason, so when you find something that has neither rhyme nor reason, it is wise to begin looking for the 'bug under the chip'."

We have here a case where all the facts and conditions are such that all reasonable men without hesitation will agree that the purpose and effect in the act here involved was to equalize the salary of all members of the Supreme Court.

This purpose in itself was not an unreasonable or unlaudatory one, if the same could be done without violating our Constitution, the supreme law of the land.

We do not impugn the morals or motive of the Legislature. This does not and should not enter into the questions here presented, and I say that all of the cases cited in the majority opinions on this question are without the point, and have no hearing on the real questions presented in this case.

Therefore, in conclusion, I must dissent from majority opinion herein, and hold that the writ should be denied.

LACKEY and WOODALL, Special Justices, concur in the conclusions reached in this dissenting opinion.

LACKEY, S. J. (dissenting). I concur in the conclusions reached by Justice Lucas in his dissenting opinion and desire to make this additional statement.

Plaintiffs, being the members of the Supreme Court of this state elected at the general election held November 6, 1934, base their right of recovery for services performed and being performed by them under House Bill No. 239, of the Sixteenth Legislature, which, omitting the title and enacting clause, reads as follows:

"Inasmuch as the laws of Oklahoma on civil and probate procedure, including procedure relating to appeals to the Supreme Court, are, by reason of the many apparently conflicting and ambiguous provisions relating thereto which have been enacted since the adoption of the Revised Laws of Oklahoma of 1910, in such a state of confusion and uncertainty that in many cases the rights of litigants and of parties affected are prejudiced, impaired or destroyed, which condition can be most properly remedied by the preparation and publication of an annotated compilation of said laws and proper explanatory notes thereon, it shall be the duty of the Justices of the Supreme Court of Oklahoma who were elected at the regular general election held on November 6, 1934, to prepare, in such manner as they deem proper, an annotated compilation of all such laws, including all laws enacted by the Fourteenth, Fifteenth and Sixteenth Legislatures of Oklahoma; said compilation and annotations to be supplemented by proper explanatory notes, which compilation shall be filed in the State Library as a public record, and as such shall be subject to inspection by the public and to publication by any responsible law book or other pub-

lishing company. Said annotated compilation and explanatory notes shall be, from time to time, supplemented by said Justices so as to include any changes occasioned either by legislative enactment or judicial interpretation; provided that said compilation shall be completed and said supplemental services terminated by the second Monday of January, 1941; provided further that before said Justices shall be authorized or required to perform the services defined by this act, same to be performed so 'as not to interfere with their regular official duties, they shall each file a certificate in the office of the Secretary of ·State setting forth their willingness to perform said services.

"Section 2. Salary.

"Each of said Justices of the Supreme Court shall receive as compensation for the services required by this act an annual salary of $2,500.00, payable monthly.

"Approved May 22nd, 1937."

The defendants in their answer plead several defenses, to only one of which I deem it necessary to refer, as it appears to me to be decisive of the question involved; same being that said act is in violation of section 10 of article 23 of the Oklahoma Constitution, which reads as follows:

"Except wherein otherwise provided in this Constitution, in no case shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment; nor shall the term of any public official be extended beyond the period for which he was elected or appointed; Provided, That all officers within this state shall continue to perform the duties of their offices until their successors shall be duly qualified."

In my opinion said act is in violation of said constitutional provision which says:

"That in no case shall the salary or emoluments of any public official be changed after his election or appointment or during his term of office."

The framers of the Constitution must have known the meaning of the words used in this section. The word "no" is defined in Webster's New International Dictionary as meaning, "not any; not at all; not in any respect or degree."

The word "emolument" is by the same authority defined as "profit from office, employment or labors; compensation; perquisites, fees or salary."

The pleadings of the parties disclose the fact that the original plaintiffs were, the

only members of the Supreme Court elected in 1934; that their salaries as fixed by law at the time of their election was the sum of $5,000 per year; that the salaries of the other members of the court, who had been elected prior to 1934, was the sum of $7,500 per year; that the salaries of the members elected subsequent to 1934 was the sum of $7,500 per year.

The bill under consideration clearly shows that no person except a member of the Supreme Court who was elected in 1934 was eligible to perform the services required by said bill and to draw the salary therein provided.

That the services required to be performed by the plaintiffs herein are and will be beneficial to · the bench and the bar of this state as well as to the public, I do not dispute; neither, in my opinion, can it be fairly said that the compensation fixed by the Legislature for such services will not have been earned.

That the plaintiffs are performing the same services on the Supreme Court at a salary of $2,500 per year less than the other six members of the court is not disputed; that they perform them as ably and conscientiously as .the other members of the court, no person who is familiar with the labors of the court will deny; that the situation, as the same exists, is, as to the plaintiffs, grossly unfair, I think all thoughtful men will agree; but, believing all of this to be true, I cannot subscribe to the opinion that they are entitled to the relief sought.

To adopt the majority view of the court, as set out in its opinion, seems to me to destroy the plain language and. intent of the section of the Constitution heretofore quoted, and that said section by the majority opinion is now in effect made to read:

"In no case shall the salary or emoluments of any public official be changed after his election or appointment or during his term of office unless by operation of law enacted prior to such election or appointment, except where the Legislature may provide that said official may receive a salary or emolument from the state, while such official, for duties 'nongermane' to his· office."

I am not unaware of the rule that "In passing upon the validity of a statute, every reasonable doubt should be resolved in its favor"; but I am also aware of the rule which. says that "Where. a .statute is clearly violative of a plain constitutional limitation, it will be held void."

It is my opinion that the act in question is "clearly violative" under the section of the Constitution heretofore quoted.

This court has never before been called upon to pass squarely upon this exact question, and while it may be that the weight of authority from other states has upheld provisions of their Constitutions similar but not in the exact language of ours, I therefore believe that this court should not commit itself to the doctrine as announced in the majority opinion.

It is not necessary to dwell upon all the evils which can and may flow from the opinion handed down by the majority. Suffice it to say that if said opinion is adopted as the law of this state, in my opinion, the bars are down and the Legislature may at its convenience increase by indirection the salary, emoluments, or compensation of each elected public official regardless of when his term of office may begin. I had always thought that the Legislature is clearly prohibited from doing by indirection that which it cannot do directly.

Believing, as I do, that said act violates the plain provisions of the Constitution of this state, I respectfully concur in the conclusions reached by Justice LUCAS.